## Wingard Petition

*Wilbert H. Beachy, Jr.*, for petitioner.

LANSBERRY, P. J., March 27, 1956.—David Lichliter, supervising principal of the Forbes Joint School District, and in its behalf, presented a petition to the Court of Quarter Sessions of Somerset County, sitting as the Juvenile Court, praying for an order requiring Lewis E. Wingard and Myrtle Wingard, parents of Earl Wingard, a minor child of the age of 11 years who is almost totally deaf, to comply with the compulsory education provisions of the prevailing school laws. The petition was properly served upon respondent parents and although no answer thereto was filed, respondent parents together with their minor son appeared at the juvenile court hearing where the testimony of petitioners as well as that of the parents was received.

From the petition and testimony the basic facts are readily apparent. Lewis E. and Myrtle Wingard, husband and wife, are residents of Quemahoning Township, Somerset County, and within the Forbes Joint School District and are the parents of four minor children of which Earl Wingard, born November 29, 1943, is the youngest. During the fall semester of 1955, Earl Wingard attended the public school regularly from September until December, after which he attended the Western Pennsylvania School for the Deaf at Pittsburgh for a brief period and from which

he was removed by his parents and since which removal he has not attended the public schools of his district nor has he had the benefit of a private tutor. When last in the public school he was in the fourth grade class where his ability in reading was comparable to that of a first grade pupil and where his work in arithmetic, English and history was not only far below standard but practically negligible. It was necessary for his teacher, in attempting to communicate with him, to sit closely by his side and shout to him in order for him to have any comprehension of the work and study to be done. On the playground he was troublesome and because of his habit of annoying the other children, was the subject of disciplinary conferences with the school principal on an average of once a week and which behavior problem could only be partially controlled by allowing him recess when the older pupils were permitted their recess. His cumulative school record was devoid of any grades for the reason that none of his teachers were or could be successful in imparting any instruction to him.

Dr. Francis X. Blair, an audiologist from Pittsburgh, testified that on October 10, 1955, he examined Earl Wingard, then 11 years, 11 months of age, to ascertain the "measurement of his hearing accuracy" and further to determine in his opinion whether there was a possibility of a "rehabilitation of his hearing losses", using in these examinations the true tone test and the speech auditory tests. From these examinations the expert concluded that as to Earl Wingard's right ear there was a severe loss of hearing resulting in his being educationally deaf and as to his left ear there was a moderate loss of hearing which may be amendable to some degree. Dr. Blair further found that his examination on October 10, 1955, confirmed the findings in a prior examination and further asserted that this child's hearing loss was probably a

permanent type of impairment. Concluding his testimony, Dr. Blair stated that the "speech function level" of Earl Wingard was that of a three year old child, that it was impracticable to send him to a public school and that the Western Pennsylvania School for the Deaf was a proper and suitable institution and school for him.

Petitioner also called as an expert witness, Dr. Donald L. Cassatt, a psychologist, presently employed as supervisor of Special Education of Somerset County who in 1953 and 1955 administered well known and approved tests to ascertain the personality and intelligence levels of Earl Wingard. From these tests Dr. Cassatt established that the child's age achievement level was that of a child between five and one-half and six years of age, notwithstanding he had a normal intelligence level which differential resulted from his inability to hear and communicate. These tests further demonstrated that Earl Wingard had made no improvement between the time of the first test and the second test and this witness further testified the subject could not go beyond his present achievement level, i. e. the first grade level, in the public schools for the reason stated. The results of the personality tests made by Dr. Cassatt further revealed Earl Wingard to be a problem child in relation to his environment and associates.

With reference to the whole problem it is apparent that these parents were fully informed and advised as to the situation with regard to their minor son and likewise the requirements of the applicable laws and, while they were inclined to be cooperative with the school authorities and sincerely desired that their son's situation be improved, the evidence is that they object to carrying out the unanimous recommendations of the professional experts, assigning as their reason or perchance more properly their excuse therefor that the

recommended school does not properly teach the children there but rather allows them to learn to communicate by sign language or motions. In view of this objection, Dr. Blair, being identified with the staff of the Western Pennsylvania School for the Deaf, was recalled to the stand and testified "the method of instruction in the class room in the school is what is termed the oral type method in which speed and lip reading are definitely taught . . . " and that the motions and sign language objected to by respondents is the natural result of several hundred deaf children being together and in their own way attempting to communicate with each other and which communication methods are in fact not permitted in the classrooms.

From all of the testimony in this record, these uncontradicted, and we may say inescapable, facts are established: That Earl Wingard, because of his greatly impaired hearing ability, which is in all probability a permanent impairment, has been unable to advance either his achievement or personality level in the public schools beyond that of a first grade pupil, that his hearing is so defective as to make it impracticable to have him educated in the public schools of the district in which he is a resident, that because of his normal intelligence, these levels might be raised if schooled in an institution using and applying the special techniques which have been established and successfully used in other similar situations, that the Forbes Joint School District is without these special techniques and not equipped to further advance Earl Wingard because of his particular and specific hearing disability and that this factual situation is understood and comprehended by these respondent parents.

With the foregoing facts in mind we may now turn our attention to the applicable provisions of our law considering first, compulsory education of physical

defectives and second, the jurisdiction of the juvenile court in the premises.

It is one of the cardinal policies of our law that all the children of our Commonwealth shall be properly educated either in a system of day schools as established by law, in a recognized private school or privately tutored and that this education shall be in the subjects and activities prescribed by the State Council of Education, taught in the English language. To this end the legislature has enacted the compulsory school attendance laws: Public School Code of March 10, 1949, P. L. 30, sec. 1326, 24 PS §13-1326. These enactments are constitutional: Commonwealth ex rel., v. Bey, 166 Pa. Superior Ct. 136; Commonwealth v. Beiler, 168 Pa. Superior Ct. 462. In extension of these compulsory attendance provisions, the legislature has specifically and pertinently provided for the education of physically defective children within the ages established in the following section of the Public School Code:

"Every parent, guardian, or other person, having control or charge of any child of compulsory school age who is deaf or blind, or is so crippled, or whose hearing or vision is so defective as to make it impracticable to have such child educated in the public schools of the district in which he is a resident, shall allow such child to be sent to some school where proper provision is made for the education of the deaf, or of the blind, or of crippled children, or shall provide for the tuition of such child by a legally certified private tutor": Public School Code of March 10, 1949, P. L. 30 sec. 1328, 24 PS §13-1328.

The language of this section is not only clear and precise but it is also mandatory; moreover, it is specifically applicable to the facts in this case. We have no alternative but to declare that these respondent parents "shall allow" Earl Wingard "to be sent to some

school where proper provision is made" for him to be educated because of his deafness or in the alternative, provide for the tuition that he may be educated by a legally certified private tutor. Under all the circumstances here the latter course is not feasible and such an order might become unduly oppressive. It is apparent that the Western Pennsylvania School for the Deaf meets the standards and requirements and is specifically equipped to provide some further education for this child whereby he may advance his intelligence and personality levels despite his physical handicaps. The objections interposed by respondents appear to be based on a misapprehension of the true facts regarding the Western Pennsylvania School for the Deaf rather than a faulty or objectionable program of teaching those enrolled.

In view of the foregoing principle of law here applicable, the question or issue of the enforcement of that law is presented, namely, whether or not the juvenile court of this county possesses the necessary jurisdiction to enter an appropriate order requiring Earl Wingard's placement and attendance at a suitable school where he may be educated. We think that jurisdiction is undoubted and we shall set forth our reasons therefor, as well as for the order we shall enter.

The jurisdiction of the juvenile court, although statutory and thus limited, is nevertheless, because of its exclusive qualities, quite broad and effective in the matters of delinquent, neglected and dependent children under the age of 18 years. Section 2 of that law provides:

"Except as hereinafter provided, the several courts, as defined in this act, shall have and possess full and exclusive jurisdiction in (a) all proceedings affecting delinquent, neglected and dependent children; and (b) of all cases of adults charged with contributing to,

or encouraging, or tending to cause, by any act of omission or commission, the delinquency, neglect or dependency of any child, or charged with any act of omission or commission with respect to any child, which act of omission or commission is a violation of any State law or ordinance of any city, borough or township": Juvenile Court Law of June 2, 1933, P. L. 1433, sec. 2, 11 PS §244.

Manifestly this court is given exclusive jurisdiction, inter alia, in all cases of adults charged with contributing to, encouraging or tending to cause either by acts of omission or commission the neglect of any child which act is or may be a violation of any State law. Here we are not concerned with either the delinquency or dependency of Earl Wingard but rather the question whether by their acts of omission in not complying with the compulsory education provisions of the Public School Code, these parents have neglected this child. As defined in the Juvenile Court Law, a neglected child includes "a child whose parent . . . neglects or refuses to provide proper or necessary subsistence, education, medical or surgical care, or other care necessary for his or her health, morals or well being": Act of June 2, 1933, P. L. 1433, sec. 1(5) (c), 11 PS §243.

Admittedly by this very broad definition of a neglected child, a considerable latitude of jurisdiction and a corresponding responsibility rests upon the juvenile court and such may not be exercised lightly to the deprivation of natural parents in the exercise of their natural and parental custody and control of their children. Where, however, a natural parent, either because of a misapprehension as here, or because of sheer obstinacy, which is not this case, actively prevents the carrying out of a law intended and designed for the best interests and welfare of that parent's child, that child is a neglected child and the jurisdiction of

the juvenile court over that parent may be exercised.

We have not found any Pennsylvania precedents holding a child in the circumstances here presented to be a neglected child and hence we shall pursue the inquiry further. Webster's New International Dictionary, Second Edition (1953) in part defines neglect as: "Omission of proper attention; disregard of duty, from indifference or willfulness; failure to do, use, or heed anything; negligence."

It would seem that this is precisely what the legislature had in mind in its statutory catalogue of neglected children. Ordinarily we think of a neglected child as one who is neglected in so far as his physical necessities and comforts are concerned, such as his food, clothing and shelter. These are not the all inclusive considerations, however. Our civilization has advanced to that point where the proper education of a child is a necessity secondary only to that of his food, clothing and shelter if he is to become a man and take his place in a highly competitive and curiously interdependent society. To fail to provide this necessity today, either willfully or by negligent omission, may be accounted neglect in the circumstances.

In Rose Child Dependency Case, 161 Pa. Superior Ct. 204, p. 212, our Superior Court understandably held that a child merely dependent on private charity is not neglected. In Commonwealth v. Bickel, 78 Pa. Superior Ct. 348, the court adhered strictly to the legislative definition of a neglected child (Act of April 23, 1903, P. L. 274), as one "who is destitute, homeless, abandoned or dependent upon the public for support or who has not proper parental care or guardianship", which definition is too narrow and restricted today and which legislative definition has been superseded and broadened to meet modern conditions by section 1 of the present Juvenile Court Law of June 2, 1933, P. L. 1433, 11 PS §243.

The precise portion of the statutory definition of a neglected child here pertinent was considered by Judge Stadtfeld in Marsh's Case, 140 Pa. Superior Ct. 472, wherein the father refused to have his son vaccinated as required by law. In the opinion the court said, page 477:

"The issue presented in the instant case is not, however, one of compulsory vaccination, but one of compulsory education. The appellant, John Marsh, had no option to exercise in the matter of granting or refusing proper education to his child, who was of school age and in normal physical and mental condition. Eugene Marsh is entitled to the benefit of proper education. Of this benefit, his father cannot, under the circumstances of this case, deprive him. The only choice the appellant had in this matter was that of permitting his son to be vaccinated and thereby qualified for admission to a public, private or parochial school, or, in the alternative, providing other adequate and systematic instruction, as, for example, under a properly qualified private tutor and thus avoid the requirement of vaccination. Having failed to do either, appellant must be deemed to have neglected or refused to provide proper or necessary education for his son. Appellant's contention that the child was 'sent' to school, cannot, by any strain of language be construed to be a compliance with the provisions of the law. His refusal to have the child vaccinated was as effective a restraint upon the latter's attendance at school as the application of any physical force. The conclusion necessarily follows that Eugene Marsh must be adjudged a 'neglected child' within the meaning of the Juvenile Court Law, and the court below, sitting as a Juvenile Court, having full, exclusive jurisdiction in all proceedings affecting delinquent, neglected and dependent children, has, in our opinion, properly adjudged Eugene Marsh to be

a neglected child and ordered him committed into the care and custody of the Cumberland County Welfare Services."

What was said by Judge Stadtfeld in the Marsh case is equally applicable here since the present school code now specifically provides for compulsory education not only of the physically normal child but the child, such as here concerned, who is afflicted with a physical abnormality.

Two methods of procedure are established by the Juvenile Court Law for the initiation of that court's jurisdiction and the exercise of its authority; these are by petition to the court and by a magistrate's commitment: Juvenile Court Law of June 2, 1933, P. L. 1433, sec. 4, 11 PS §246. The method here pursued is that set forth in the first portion of the above section as follows:

"Upon the petition of any citizen, resident of the county, setting forth that (a) a child, giving his or her name, age, and residence is neglected, dependent or delinquent, and is in need of care, guidance and control, (b) the names and residence of the parents, if any, or of his or her legal guardian if there be one, (c) the name and residence of the person or persons having control of the child, and (d) the name and residence of the nearest relative if no parent or guardian can be found."

Here the supervising principal of the school district, acting for that district, presented the petition to the juvenile court alleging the foregoing essential facts, upon which petition a preliminary order was entered fixing a time for hearing, directing service of the petition be made upon respondent parents and as specifically provided in section 6, 11 PS §248, required the presence of the parents and child at the hearing. The procedures here were in accordance with the provisions of the act and all the parties were properly

before the juvenile court and subject to the orders of that tribunal.

In section 8 of the Juvenile Court Law of June 2, 1933, 11 PS §250, the procedure at the hearing, together with the court's authority to make appropriate orders in the premises is outlined. The pertinent provisions of that section are:

"At the hearing, or any continuation thereof, the judge or judges shall, after an inquiry of the facts, determine whether the best interests and welfare of a child and the State require the care, guidance and control of such child, and shall make an order accordingly," and further:

"The Court may . . .

"(c) Commit a child to some suitable institution or to the care of an incorporated association or society, one of whose objects is the care, guidance and control of delinquent, dependent and neglected children, and which is willing to receive said child."

Having concluded and determined that Earl Wingard is a neglected child in view of the peculiar and particular circumstances here presented, this court may make such appropriate order or orders as are necessary for the relief of the child in that particular regard, viz. his neglected status: Rose Child Dependency Case, 161 Pa. Superior Ct. 204, 208.

We are not unmindful of the objections of respondent parents to their son being enrolled in the Western Pennsylvania School for the Deaf but we think Earl Wingard's future best interests and welfare require that he be enrolled in that school in the hope that he may be successfully instructed and in part at least overcome his physical handicap. If his enrollment is approved by the Commonwealth's Department of Public Instruction, the financial burden will not fall upon these respondents (Public School Code of March 10, 1949, P. L. 30, sec. 1376, as amended, 24 PS §13-

1376) but partially upon petitioner school district and partially upon the Commonwealth.

Upon a careful consideration of the whole matter and agreeable to law, we now enter the following

## Order

Now, March 27, 1956, the petition of the Forbes Joint School District praying for an order of the juvenile court for placement of Earl Wingard, now aged 12 years, a minor child of Lewis E. Wingard and Myrtle Wingard in a suitable school for deaf children having come on for full hearing by the Juvenile Court of Somerset County, and the said juvenile court having jurisdiction of all the parties and the subject matter concerned, and the testimony on behalf of petitioners and respondents establishing the fact that Earl Wingard is a physically defective child in that he has a probable permanently impaired hearing ability which hearing is so defective as to make it impracticable for him to be educated in the public schools of the school district of his residence and the further fact that he is a neglected child because of the omission and unwillingness of his parents to enroll him in a suitable school for further instruction, and it appearing to the court that the Western Pennsylvania School for the Deaf at Pittsburgh, is a suitable and proper institution for the training and instruction of Earl Wingard, the said Lewis E. Wingard and Myrtle Wingard are ordered and directed to enroll forthwith their said minor child, Earl Wingard, in the Western Pennsylvania School for the Deaf at Pittsburgh, where he may be further instructed in the subjects as prescribed by the appropriate school laws of this Commonwealth, the record costs of this proceeding to be assessed against the Forbes Joint School District and this order to remain in full force and virtue until further order of the court.