Commonwealth *v.* Beiler, Appellant.

Argued November 13, 1950. Before HIRT, RENO, DITHRICH, ROSS, ARNOLD and GUNTHER, JJ. (RHODES, P. J., absent).

*Charles W. Eaby,* with him *Samuel S. Wenger,* for appellants.

*Elmer T. Bolla,* Deputy Attorney General, with him *John Milton Ranck,* District Attorney, *Louis S. May,* Solicitor and *Charles J. Margiotti,* Attorney General, for appellee.

OPINION BY RENO, J., March 12, 1951:

Samuel and Levi Beiler were convicted in summary proceedings before a justice of the peace and on appeal in the court below of violating the compulsory attendance provisions of the Public School Code of 1949, P. L. 30, 24 P.S. §1-101 et seq. They are members of the Old Order Amish Church, and their separate appeals invoke the protection of religious freedom guaranteed by the State and Federal Constitutions.[1]

Samuel is the father of Naomi Beiler; Levi is the father of Jacob Beiler. Both children are 14 years of age, have completed and passed the eighth grade in the public schools, and are eligible for instruction in the high school grades. Appellants refused to send their

---

[1] *Constitution of the United States.* First Amendment: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; . . ." Fourteenth Amendment: "No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; . . ."

*Constitution of Pennsylvania.* Art. I §3: "All men have a natural and indefeasible right to worship Almighty God according to the dictates of their own consciences; no man can of right be compelled to attend, erect or support any place of worship, or to maintain any ministry against his consent; no human authority can, in any case whatever, control or interfere with the rights of conscience and no preference shall ever be given by law to any religious establishments or modes of worship."

children for further instruction in the schools to which they had been assigned, and this constitutes the alleged violations of the Code. Nor have they attended private or denominational schools or received instruction from qualified tutors. Their parents hold, in conformity with the tenets of their religion, that children should not receive secular education after they have attained the age of fourteen and have completed the eighth grade of the public schools.

The Code, §§1326, 1327, 24 P.S. §§13-1326, 13-1327, requires: "Every parent . . . of any child or children of compulsory school age [between the ages of eight and seventeen] . . . to send such child or children to a day school in which the subjects and activities prescribed by the State Council of Education are taught in the English language." A "day school" includes a public school but does not exclude other methods of education, and parents may send their children to private or parochial schools or have them instructed by qualified tutors. A subsequent section of the Code, §1330, 24 P. S. §13-1330, provides various exemptions, but appellants did not apply for or secure permits which might have exempted their children from attending school.[2]

---

[2] Public School Code, §1330, 24 P. S. §13-1330: "The provisions of this act requiring regular attendance shall not apply to any child who . . . (4) Has attained the age of fourteen (14) years and is engaged in farm work or domestic service in a private home on a permit issued as provided in clause (3) of this section, and who has satisfactorily completed, either in public or private schools, the equivalent of the highest grade of the elementary school organization prevailing in the public schools of the district in which he resides, if the issuance of such a permit has first been recommended by the county or district superintendent of schools having supervision of the schools of the district where such child resides, or by the principal of the private school where such child is enrolled, and the reason therefor has been approved by the Superintendent of Public Instruction."

The Amish are our "plain people", a quiet, pious, industrious, thrifty people, whose vitalizing contributions to the welfare, and especially to the development of the agricultural resources, of the Commonwealth have always been gratefully recognized.[3] Their ancestors came to Pennsylvania in response to William Penn's personal invitation and his promise of religious liberty. They adhere, devoutly and unchangingly, to the strict and literal interpretation of the Dortricht Creed, a confession of faith adopted at Dort, Holland, in 1632, by the followers of Menno Simons, the founder of the Mennonite Church, from which sprang the Amish under the leadership of Jacob Amman.[4] Upon it, they have patterned their lives and followed it, consistently, conscientiously and faithfully.[5]

The specific doctrinal pronouncement of the Dortricht confession here relevant is: "And since it is a known fact that a lack of faithful ministers, and the erring of the sheep because of the lack of good doctrine, arise principally from the unworthiness of the people; therefore, the people of God, needing this, should not turn to such as have been educated in universities, according to the wisdom of man, that they may talk and dispute, and seek to sell their purchased gift for temporal gain; and who according to the custom of the world do not truly follow Christ in the humility of regeneration."

With that credal declaration as the doctrinal basis, and fortifying it with the citation of Biblical proof-

---

Clause (3) authorizes the Superintendent of Public Instruction to prescribe regulations for the issuance of permits. For a criticism of the regulations, see *Com. v. Petersheim*, 70 D. & C. 432.

[3] Fletcher, *Pennsylvania Agriculture and Country Life.* Pennsylvania Historical and Museum Commission, Harrisburg, p. 50.

[4] *Religious Bodies*, 1936. Bureau of the Census, II, 1003, 1023, 1028.

[5] Fletcher, *op. cit.* pp. 489, 515, 527.

texts,[6] a group of ruling bishops wrote, and during the pendency of these prosecutions, revised a "Statement of Position of Old Order Amish Church Regarding Attendance In Public Schools" from which we extract the pertinent articles: "2. We believe that our children should be properly trained and educated for manhood and womanhood. We believe that they need to be trained in those elements of learning which are given in the elementary schools. Specifically, we believe that our children should be trained to read, to write and to cipher. 3. We believe that our children have attained sufficient schooling when they have passed the eighth grade of the elementary school. This attainment is ordinarily made at age fourteen. 4. We believe when our children have passed the eighth grade that in our circumstances, way of life and religious belief, we are safeguarding their home and church training in secular and religious belief and faith by keeping them at home under the influence of their parents."

I. Seeing that the Dortricht Creed refers to men who "have been educated in universities" while the bishops' statement relates to post-eighth grade schools, the Commonwealth argues that the inconsistency indicates that the true Amish faith "does not prohibit or restrict children of their faith from going to high school."

Where property rights of members of a church are not involved, courts will not investigate or determine its faith or doctrine. The courts accept as true definitions of faith the expressions and interpretations of ecclesiastical officers, governing councils and judicatories which the church has authorized to speak for it.

---

[6] Deuteronomy 6: 6-8; Genesis 18: 19; Ephesians 4: 28; Romans 12: 1; Luke 16: 15; Ephesians 3: 19; 1 Corinthians—Chapters 1 and 2; 1 Corinthians 8: 1-3; Titus 3: 14; 1 Corinthians 15: 33; Romans 1: 21-23; James 1: 5.

"Any other than those [ecclesiastical] courts must be incompetent judges of matters of faith, discipline and doctrine": *German Reformed Church v. Seibert,* 3 Pa. 282, 291. See also *Watson v. Jones,* 13 Wall. 679, 20 L. Ed. 666; *McGinnis v. Watson,* 41 Pa. 9; *Krecker v. Shirey,* 163 Pa. 534, 30 A. 440. So, even though the bishops' statement should be in conflict with the Dortricht confession, we nevertheless accept it as the authorized exposition of the Amish faith in regard to the public schools.

II. Thus, we are squarely faced with competing demands of the Commonwealth, evidenced by its compulsory school law, and of religious liberty, guaranteed by the Constitution. Or to state the problem in other terms: In the realm of secular education, which is paramount? The State, functioning according to democratic processes and depending for its virility upon enlightened citizens; or parents, whose deep and sincere religious convictions reject advanced education as an encroachment upon their way of life? The responsibility of the Court is to find a solution which will reasonably accommodate both demands in a manner that will preserve the essentials of each.

We analyzed this question in *Com. ex rel. v. Bey,* 166 Pa. Superior Ct. 136, 140, 70 A. 2d 693, where, after reviewing numerous cases, we held: "In short, parents have no constitutional right to deprive their children of the blessings of education or prevent the state from assuring children adequate preparation for the independent and intelligent exercise of their privileges and obligations as citizens in a free democracy." To that conclusion we adhere. Its major premise is that there is no interference with religious liberty where the State reasonably restricts parental control, or compels parents to perform their natural and civic obligations to educate their children. They may be educated in the

public schools, in private or denominational schools, or by approved tutors; but educated they must be within the age limits and in the subjects prescribed by law. The life of the Commonwealth—its safety, its integrity, its independence, its progress,—and the preservation and enhancement of the democratic way of life, depend upon the enlightened intelligence of its citizens. *Teachers' Tenure Act Cases,* 329 Pa. 213, 197 A. 344. These fundamental objectives are paramount, and they do not collide with the principles of religious or civil liberty. Unless democracy lives religious liberty cannot survive.[7]

Religious liberty includes the absolute right to believe but only a limited right to act. A Mormon believed that plural marriages were divinely ordained but when he acted upon his belief he was convicted of polygamy. *Reynolds v. U. S.,* 98 U. S. 145, 25 L. Ed. 244. A Jew held his Sabbath a holy day but when he refused to be judicially sworn on Saturday he was fined. *Stansbury v. Marks,* 2 Dallas 213. A Seventh Day Baptist believed he should rest from his labors on Saturday and follow the divine command, "six days shalt thou labor", but when he worked on Sunday he was convicted under the Act of 1794. *Specht v. Com.,* 8 Pa. 312. A Mennonite maid believed she should wear the distinctive garb of her Church at all times, but she was not allowed to wear it in the school where she taught. *Com. v. Herr,* 39 Pa. Superior Ct. 454, affirmed 229 Pa. 132, 78 A. 68. Methodist students, who believed that "participation in war is a denial of their supreme allegiance to Jesus Christ", were nevertheless required to receive military

---

[7] William Penn, whose memory lies close to the Amish heart, was at once a dynamic apostle for religious freedom and a stanch advocate of public education. He wrote to a friend: "If we would preserve our government we must educate our people. The government is a trustee for the youth." Fletcher, *op. cit.* p. 478.

training at a state university. *Hamilton v. Regents,* 293 U. S. 245, 55 S. Ct. 197. A Jehovah Witness sent her minor child "to preach the gospel" by selling religious pamphlets on the public highways and was convicted of a violation of a child labor law. *Prince v. Massachusetts,* 321 U. S. 158, 64 S. Ct. 438. An imposing list of similar cases might easily be compiled. In total they apply the principle which GIBSON forcibly expressed in his memorable dissent in *Com v. Lesher,* 17 S. & R. 155, 160: "It is declared in the constitution [of 1790] . . . that 'no human authority can, in any case, control or interfere with the *rights of* conscience.' But what are those rights? Simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever on the subject of religion; and to do, or forbear to do, any act, for conscience sake, the doing or forbearing of which, *is not prejudicial to the public weal.* But *salus populi suprema lex,* is a maxim of universal application; and where liberty of conscience would impinge on the paramount right of the public, it ought to be restrained."[8] (GIBSON'S italics.)

III.   Appellants' able counsel argues that *Bey* and similar authorities do not rule this appeal and pins his faith on the flag salute cases, *West Virginia v. Barnette,* 319 U. S. 624, 63 S. Ct. 1178; *Com. v. Conte,* 154 Pa. Superior Ct. 112, 35 A. 2d 742; and *Com. v. Crowley,* 154 Pa. Superior Ct. 116, 35 A. 2d 744. He contends that since a public school pupil cannot be compelled to salute the flag, he cannot be compelled to attend school and his parents cannot be punished for refusing to send him.

The *Barnette* opinion announces no such doctrine and nothing in it supports the corollary which counsel

---

[8] This excerpt from GIBSON'S dissent was quoted with approval in *Specht v. Com.,* supra, p. 322, and *Com. v. Herr,* supra, p. 143.

seeks to draw from it. It decides only that the compulsory salute to the flag and the accompanying pledge constitute denial of the freedoms of speech and worship, because they require "students to declare a belief." (Access to Pennsylvania's common schools is not conditioned upon participation in a flag salute ceremony.) The opinion does not declare that states may not enforce compulsory school laws against religious dissidents. To the contrary, it approvingly quoted (319 U. S. p. 631, 63 S. Ct. 1182) an extract from Chief Justice STONE's dissent in overruled *Minersville School Dist. v. Gobitis,* 310 U. S. 586, 604, 60 S. Ct. 1010, 1017. There the Chief Justice said: "Without recourse to such compulsion [flag salute] *the state is free to compel attendance at school* and require teaching by instruction and study of all in our history and in the structure and organization of our government, including the guaranties of civil liberty which tend to inspire patriotism and love of country." (Emphasis added.)

Furthermore, *Barnette* did not expressly or otherwise overrule *Pierce v. Society of Sisters,* 268 U. S. 510, 534, 45 S. Ct. 571, 573, which recognized "the power of the State . . . to require that all children of proper age attend some school." And *after Barnette* was decided, the United States Supreme Court held that "the state as parens patriae may restrict the parent's control by requiring school attendance", and that, "Its authority is not nullified merely because the parent grounds his claim to control the child's course of conduct on religion or conscience": *Prince v. Massachusetts,* supra. This is the latest interpretation and application of the First and Fourteenth Amendments of the Federal Constitution by the highest court of the land. That judgment binds this Court, appellants, and their brethren.

Judgments and sentences affirmed.