No. 44,583

THE STATE OF KANSAS, Plaintiff, *Appellee*, v. LEROY GARBER, Defendant, *Appellant.*

(419 P. 2d 896)

Opinion filed November 5, 1966.

*E. Dexter Galloway,* of Hutchinson, argued the cause and was on the brief for the appellant.

*Richard J. Rome,* county attorney, argued the cause, and *Raymond F.*

*Berkley* and *Lane H. Cronhardt,* assistant county attorneys, were with him on the brief for the appellee.

The opinion of the court was delivered by

HARMAN, C.: This appeal involves the construction and constitutionality of our compulsory school attendance law as applied to the Amish people.

The action was commenced in the district court of Reno County, Kansas, by the filing of an information charging that defendant LeRoy Garber failed on or about October 18, 1965, to require his fifteen year old daughter, Sharon Garber, then under his control, to attend continuously a public school or a private, denominational or parochial school taught by a competent instructor, in violation of K. S. A. 1965 Supp. 72-4801.

A jury was waived and the action was tried to the court on a written agreed statement of facts. Defendant was found guilty as charged. Subsequently he filed motions to amend the findings and judgment and for a new trial which were all overruled, and defendant was sentenced to pay a fine of $5.00 and costs. His appeal to this court from that sentence presents two questions: First, whether under the facts he is guilty of any offense and, second, whether as applied to him our compulsory school attendance law violates his constitutionally guaranteed religious freedom.

The stipulation of the parties reveals the following pertinent facts: Defendant LeRoy Garber is a member of the Old Order Amish Mennonite Church. He is the father of Sharon Garber, who was born September 18, 1950, and who is under his control. Sharon completed the eighth grade in the public schools, finishing at Elreka, Reno County, Kansas, in May of 1964; since that time she has not been enrolled as a student at any public school in Reno County, Kansas. Her home school district is the Partridge Rural High School District in Reno County which commenced its 1965-1966 school year on August 25, 1965, to run for 180 days. In September of 1964 Sharon enrolled as a high school student in a correspondence school in Chicago, Illinois, known as the American school, and at all times applicable herein she has continued to take certain correspondence courses contained in what is known as a vocational cultural plan and has made high grades. This school is approved by the United States Office of Education for private home study under certain laws whereby tuition may be paid by the federal

government. On September 3, 1965, following the passage by the 1965 legislature of our present law requiring school attendance up to age sixteen, a group of Amish people in the Yoder community in Reno County, Kansas, established a school for their children known as the Harmony school. This school was organized pursuant to a written plan in accordance with the Amish religious faith and way of life. Its pupils are limited to those who have completed the eighth grade in public schools but have not attained the age of sixteen. It is taught by an Amish farmer whose formal education has consisted of eight grades in the public schools. Formal classes are held in the Harmony school one morning each week. On each of the remaining four school days students spend at home one hour in study and five hours in pursuit of vocational training upon which a written report is submitted to the instructor. All instruction is given in the English language except in a German reading course in which the German bible is used. Emphasis is placed on the vocational home training consisting generally of farming projects for boys and home economics and home management for girls. On October 5, 1965, defendant was served with a statutory notice of truancy (K. S. A. 72-4802) of his daughter Sharon. Thereafter and on October 15, 1965, Sharon enrolled in the Harmony school and was so enrolled on October 18, 1965.

The agreed statement of facts also contains a history of the Amish people and a recital of their religious tenets and practices. Their religion stems from a seventeenth century branch of the Mennonite Church and they adhere strictly to the beliefs, customs and traditions embraced by their forefathers. Extremely conservative, they are a quiet, industrious, plain people who cherish three great values: A devout religion, an agrarian way of life, and a cohesive family and community. These values are deeply rooted in their educational views as in all aspects of their life. A cardinal tenet in the Amish faith is the Biblical injunction, "Be not conformed to this world," adherence to which, under their rigid interpretation, has doubtless contributed to their survival as a cultural group. Opposition to public secondary schools derives from their feeling that eventually this exposure of their children to that secular influence will erode the Amish way of life.

The first question posed is whether the facts support the finding of guilt of the defendant. Our compulsory school attendance statute is K. S. A. 1965 Supp. 72-4801 which provides in pertinent part:

"That every parent, guardian or other person in the state of Kansas, having control over or charge of any child who has reached the age of seven years and is under the age of sixteen years, shall require such child to attend continuously a public school or a private, denominational or parochial school taught by a competent instructor, in which all instruction shall be given in the English language only, each school year, for such period as the public school of the district in which the child resides is in session.

"Any child who is physically or mentally incapacitated for the work of the common schools is exempt from the provisions of this act. . . . If such child is found capable of doing the work of the common or high schools, as the case may be, the child shall not be exempt from the provisions of this act, except as specifically provided herein. A child attending secondary schools in this state shall not be required to participate in any activity which is contrary to the religious teachings of such child, if a written statement signed by one of the parents or the guardian of such child is filed with the proper authorities of the school attended, requesting that the child not be required to participate in such activity and stating the reason for such request."

Noteworthy is the fact the act provides exemption only on the basis of physical or mental incapacity. K. S. A. 72-4802 complements the foregoing by prescribing an enforcement procedure, including service of truancy notice, and penalty for violation.

Defendant contends Sharon's enrollment in both the American school and the Harmony school satisfied the statute.

We have had compulsory school attendance laws in Kansas since 1874. Numerous amendments throughout the years reflect our transition from the frontier era. These changes have been in the number and nature of exemptions granted, the minimum and maximum ages of the children affected, and the length of time prescribed for school attendance. The last amendment and the one precipitating this lawsuit was the elimination in 1965 of the proviso that the act should not apply to any child who has completed the eighth grade. One of the earlier changes is particularly significant for our purposes here. Prior to 1903 our truancy act provided, as an acceptable excuse for not requiring one's children to attend a public school,

". . . that such child or children are taught at home in such branches as are usually taught in the public schools, subject to the same examination as other pupils of the district or city in which the child resides. . . ." (G. S. 1901, § 6420.)

The act was amended in 1903 by the elimination of the home study exemption. This court dealt with the effect of the amendment in *State v. Will*, 99 Kan. 167, 160 Pac. 1025, stating:

"In the later act, which obviously was for the purpose of improving the

truancy law and providing means for its enforcement through truancy officers, the significant language of the earlier act concerning the course of study imposed on home-taught pupils is left out. There must have been a reason for that. The act of 1903 (Laws 1903, ch. 423, Gen. Stat. 1909, § 7736 *et seq.*) enlarges as to the kind of schools which a child may attend to excuse him from public school attendance. They may be either 'private, denominational or parochial,' but nothing is said as to the course of study in such schools. These schools must be taught 'by a competent instructor, each school year, for such period as said school is in session.' May we not assume that the legislature knew what it was about when it provided in the earlier act that if the child were taught at home it must be in the common-school branches and that the child should be subject to examination as other district and city pupils might be. This provision would serve a useful and almost necessary purpose to prevent a mere pretense of home instruction to avoid the consequences of the truancy law. In the later act, it will be observed that home instruction is no longer an excuse for nonattendance in school, but the number and kind of schools to which he may be sent are enlarged. They may be either private, denominational or parochial." (p. 170.)

In *State v. Lowry*, 191 Kan. 701, 383 P. 2d 962, this court applied the reasoning expressed in *Will* and refused to approve what amounted to scheduled home instruction as an excuse for nonattendance in schools prescribed in the truancy act.

Thus we see neither the American nor the Harmony school, being essentially home instruction systems, constitutes a private, denominational or parochial school within the meaning of our truancy act. Even if, as contended by defendant, the instruction given through them could be considered as instruction equivalent to that given in a public, private, denominational or parochial school, this would not be an excuse for nonattendance at the latter for the reason that the legislature has made no provision for such equivalent instruction as the basis for exemption. The only exemption now enumerated in our truancy law as being acceptable for not sending a child to one of the named schools being for physical or mental disability of the child, this is, in view of the legislative history of the statute, deemed exhaustive of such exemptions.

It should be noted moreover that our law requires that the child "attend *continuously* . . . *for such period as the public school of the district in which the child resides is in session.*" (Our emphasis.) K. S. A. 72-1106 provides:

"A school month shall consist of four (4) weeks of five (5) days each of six (6) hours per day on which pupils of a school are under direct supervision of its teacher or teachers while they are engaged together in educational activities. . . ."

From our examination of this statute we conclude it is one of general application and is to be considered in connection with the compulsory attendance law in determining the requisite period of attendance. Sharon did not attend any school wherein the school month consisted of four weeks of five days each of six hours per day during which pupils were under direct supervision of a teacher. Hence she did not continuously attend any school acceptable under our statute during the time the Partridge Rural High School was in session from August 25, 1965, through October 18, 1965. Therefore, her father, no matter how sincere or well intentioned, must be deemed guilty of violating the statute.

Defendant makes no general attack upon our compulsory school attendance law and indeed the validity of such laws has generally been recognized, for the natural rights of a parent to the custody and control of his child are subordinate to the police power of the state and may be restricted and regulated by municipal law providing minimum educational standards (79 C. J. S., Schools and School Districts, § 463 b.; 47 Am. Jur., Schools, § 156). The promotion of education is a legitimate function of the state, and in Kansas is one particularly imposed on the legislature by article 6, section 2 of the constitution (See, *State, ex rel., v. Kemp*, 124 Kan. 716, 261 Pac. 556). Defendant does challenge the application of the law to him by asserting it infringes upon his religious freedom guaranteed by our state and federal constitutions. The bill of rights of our state constitution, section 7, provides:

"The right to worship God according to the dictates of conscience shall never be infringed; nor shall any person be compelled to attend or support any form of worship; nor shall any control of or interference with the rights of conscience be permitted, nor any preference be given by law to any religious establishment or mode of worship. . . ."

The first amendment of the federal constitution provides:

"Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof. . . ."

and the fourteenth amendment thereof provides:

". . . No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States. . . ."

There is no contention here that the statute is unconstitutional because Sharon is compelled by law to go only to a secondary public school. The statute does not so require and would be invalid if it did although it is recognized the state can require that all children

of proper age attend some school (*Pierce v. Society of Sisters,* 268 U. S. 510, 69 L. ed. 1070, 45 S. Ct. 571, 39 A. L. R. 468). Parents do have the right to educate their children elsewhere than in the public schools, provided the state's minimum educational requirements are met (*Zorach v. Clauson,* 303 N. Y. 161, 100 N. E. 2d 463, affirmed in 343 U. S. 306, 96 L. ed. 954, 72 S. Ct. 679).

In accommodating between the competing right of the state to compel action in the public welfare and the right of the individual to his constitutional religious freedom the courts have distinguished between religious beliefs and religious practices. Failure to comply with reasonable requirements in the exercise of the police power for the general welfare has never been condoned in the name of religious freedom. As stated in *Commonwealth v. Beiler, Appellant,* 168 Pa. Super. 462, 79 A. 2d 134, 137,

"Religious liberty includes the absolute right to believe but only a limited right to act." (p. 468.)

These general principles have been invoked many times. Examples of distinctions made between belief and practice are concisely set forth in *Beiler,* supra, as follows:

"A Mormon believed that plural marriages were divinely ordained but when he acted upon his belief he was convicted of polygamy. *Reynolds v. U. S.,* 98 U. S. 145, 25 L. Ed. 244. A Jew held his Sabbath a holy day but when he refused to be judicially sworn on Saturday he was fined. *Stansbury v. Marks,* 2 Dallas 213. A Seventh Day Baptist believed he should rest from his labors on Saturday and follow the divine command, 'six days shalt thou labor', but when he worked on Sunday he was convicted under the Act of 1794. *Specht v. Com.,* 8 Pa. 312. A Mennonite maid believed she should wear the distinctive garb of her Church at all times, but she was not allowed to wear it in the school where she taught. *Com. v. Herr,* 39 Pa. Superior Ct. 454, affirmed 229 Pa. 132, 78 A. 68. Methodist students, who believed that 'participation in war is a denial of their supreme allegiance to Jesus Christ', were nevertheless required to receive military training at a state university. *Hamilton v. Regents,* 293 U. S. 245, 55 S. Ct. 197. A Jehovah Witness sent her minor child 'to preach the gospel' by selling religious pamphlets on the public highways and was convicted of a violation of a child labor law. *Prince v. Massachusetts,* 321 U. S. 158, 64 S. Ct. 438. An imposing list of similar cases might easily be compiled. In total they apply the principle which Gibson forcibly expressed in his memorable dissent in *Com. v. Lesher,* 17 S. & R. 155, 160: 'It is declared in the constitution [of 1790] . . . that "no human authority can, in any case, control or interfere with the *rights of* conscience." But what are those rights? Simply a right to worship the Supreme Being according to the dictates of the heart; to adopt any creed or hold any opinion whatever on the subject of religion; and to do, or forbear to do, any act, for conscience sake, the doing or forbearing of which, *is not prejudicial to the*

*public weal.* But *salus populi suprema lex,* is a maxim of universal application; and where liberty of conscience would impinge on the paramount right of the public, it ought to be restrained.' (Gibson's italics.)" (pp. 468, 469.)

In *Prince v. Massachusetts,* 321 U. S. 158, 88 L. ed. 645, 64 S. Ct. 438, mentioned in *Beiler* above, the parent as a member of Jehovah's Witnesses claimed the right "to bring up the child in the way he should go [and] to teach him the tenets and practices of our faith." (p. 164.) In commenting on the parental claim the court said:

"But the family itself is not beyond regulation in the public interest, as against a claim of religious liberty. *Reynolds v. United States,* 98 U. S. 145; *Davis v. Beason,* 133 U. S. 333. And neither rights of religion nor right of parenthood are beyond limitation. Acting to guard the general interest in youth's well being, the state as *parens patriae* may restrict the parent's control by requiring school attendance, regulating or prohibiting the child's labor and in many other ways [citing cases]." (p. 166.)

Applying the foregoing, we are unable to perceive from the record before us how religious freedom is abridged in this case. There is no infringement upon the right to worship or to believe insofar as either defendant or his daughter is concerned. Their freedoms to worship and to believe remain absolute and are not affected by our compulsory school attendance law. Defendant may instruct his daughter in religious beliefs as he desires. It can scarcely be doubted that defendant is sincere when he says his religious convictions are violated if his daughter receives a secular type of education found in the secondary public schools, but it is apparent he does not object to secular education *per se* since his daughter has attended the elementary public schools eight years. We are not called upon to attempt to prescribe any permissible degree of secularity in education beyond which religious freedom is infringed. The question of how long a child should attend school is not a religious one. No matter how sincere he may be the individual cannot be permitted upon religious grounds to be the judge of his duty to obey laws enacted in the public interest (*Rice v. Commonwealth,* 188 Va. 224, 49 S. E. 2d 342, 3 A. L. R. 2d 1392). We think the particular law at issue here is valid as applied to defendant and his daughter and does not infringe upon constitutionally guaranteed religious freedom.

For other decisions in harmony with the position taken herein on this question, see the following: *Com. ex rel. Sch. Dist. of PGH. v. Bey et ux.,* 166 Pa. Super. 136, 70 A. 2d 693; *Commonwealth v. Smoker, Appellant,* 177 Pa. Super. 435, 110 A. 2d 740; *State ex rel.*

*Shoreline etc. v. Sup. Ct.,* 55 Wash. 2d 177, 346 P. 2d 999, cert. den., 363 U. S. 814, 4 L. ed. 2d 1154, 80 S. Ct. 1248; *Shapiro v. Dorin,* 199 Misc. 643, 99 N. Y. S. 2d 830, affirmed without opinion, 278 App. Div. 705, 103 N. Y. S. 2d 757, affirmed without opinion, 302 N. Y. 857, 858, 100 N. E. 2d 48; *In Re Currence,* 42 Misc. 2d 418, 248 N. Y. S. 2d 251; *Cude v. State,* 237 Ark. 927, 377 S. W. 2d 816; *Mosier v. Barren County Board of Health,* 308 Ky. 829, 215 S. W. 2d 967; *Commonwealth v. Renfrew,* 332 Mass. 492, 126 N. E. 2d 109; *State v. Hershberger,* 103 Ohio App. 188, 144 N. E. 2d 693.

The judgment is affirmed.

APPROVED BY THE COURT.