STATE, Respondent, v. YODER, Appellant. [No. State 92.]
STATE, Respondent, v. YUTZY, Appellant. [No. State 93.]
STATE, Respondent, v. MILLER, Appellant. [No. State 94.]

*Nos. State 92–94. Argued December 1, 1970.—Decided January 8, 1971.*
(Also reported in 182 N. W. 2d 539.)

For the appellants there was a brief by *William B. Ball, Joseph G. Skelly,* and *Ball & Skelly,* all of Harrisburg, Pennsylvania, and by *Thomas C. Eckerle* and *Risser & Risser,* all of Madison, and oral argument by *Mr. Eckerle* and *Mr. William B. Ball.*

For the respondent the cause was argued by *John W. Calhoun,* assistant attorney general, with whom on the brief were *Robert W. Warren,* attorney general, and *Louis A. Koenig,* district attorney of Green county.

A brief amici curiae was filed by *James L. Greenwald* of Madison for Reverend Willis J. Merriman, Executive Vice President of the Wisconsin Council of Churches; Dr. Manfred E. Swarsensky, Rabbi, Temple Beth El, Madison; and Msgr. Andrew R. Breines, Pastor of Saint Thomas Aquinas Parish, Madison, and Madison editor of the Catholic Herald Citizen.

HALLOWS, C. J.   No liberty guaranteed by our constitution is more important or vital to our free society than is a religious liberty protected by the free exercise clause of the first amendment. This appeal poses the question of whether the compulsory education law of this state, as applied to the Amish, infringes their religious liberty and, if so, whether such interference is constitutionally justified.

If the compulsory education law is to withstand the appellants' constitutional challenge, it must be either because the statute does not interfere with a constitutional freedom to act in accordance with their sincere religious beliefs or because the burden on the free exercise of appellants' religion is justified by a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate . . . ." *NAACP v. Button* (1963), 371 U. S. 415, 438, 83 Sup. Ct. 328, 9 L. Ed. 2d 405. The determination of whether a law infringing religious liberty is justified requires the weighing of the burden on the free exercise of one's religion and the importance of the state's interest asserted in justification of the substantial infringement. *Sherbert v. Verner* (1963), 374 U. S. 398, 83 Sup. Ct. 1790, 10 L. Ed. 2d 965.

*Is there any infringement*
*of the free exercise clause?*

"The Amish as an independent sect were founded in 1693, near Erlenbach, Bern, Switzerland. Jakob Ammann, a Swiss Anabaptist and a follower of Menno Simons and the Mennonites, broke with his church in disagreement over what he felt were unwarranted departures from traditional practices. The Amish, the followers of Ammann, thus dedicated themselves to maintaining the old practices and resisting any capitulation to the sin of worldliness. . . .

"The Old Order Amish are the most conservative and traditional of the several branches of the sect, numbering about fifty thousand children and adults in the United States." *The Amish and Compulsory Education,* 53 Va. L. Rev. (1967), 925, 933.

The rules of conduct of the Amish religion in its folk culture context are incorporated in the Ordnung of each community but ordinarily are not articulated and codified in writing as some tenets in other theistic religions. Compliance with the Ordnung is enforced by sanctions of excommunication and shunning. *See* Hostetler, *Amish Society* (1963), p. 63; Yoder, *Caesar & The Meidung,* 23 Mennonite Qtrly. Rev. (1949), 76, 98. Many of the tenets of the religion are found in *The Confession of Dortricht* (1632) [3] discussed in *Commonwealth v. Beiler* (1951), 168 Pa. Super. 462, 79 Atl. 2d 134, 136. The lack of codification of the Amish tenets is of no concern. The free exercise clause does not require the codification of religious tenets nor does this clause define the scope of religion. For its purpose, religion defines itself and binds the individual conscience.

At the trial the appellants put in evidence by expert testimony the full range of the Amish religious beliefs and the tenets of the Old Order Amish religion. Dr. John A. Hostetler [4] testified the Amish religion requires

---

[3] It is stated by Robert C. Casad in his article entitled *Compulsory Education and Individual Rights,* 5 Religion And The Public Order 55, the most basic tenet of the Amish religion of separation from the world relies on the Scripture, Romans 12:1 [12:2], "Be not conformed to this world, but be ye transformed by the renewing of your mind that ye may prove what is that good, and acceptable, and perfect, will of God," and II Corinthians 6:14, "Be ye not unequally yoked together with unbelievers; for what fellowship hath righteousness with unrighteousness? and what communion hath light with darkness?" To the Amish, these beliefs "are not mere social philosophy: They are fundamental to the whole question of their existence on earth."

[4] Professor at Temple University; author of *"Amish Life* (1968)," *"Amish Society* (Revised Ed. 1968)."

as a part of the individual's way of salvation a church community separate from the world. The Amish separateness is dictated by their religious belief of what God's will is for them and thus all the means by which they maintain this unique separateness have religious meaning.

The Old Order Amish religion dictates that the Amish child from the inception of adolescence live according to the mode of life in the Amish community; that he should not attend high school since any high school, public or private, constitutes a deterrent to his salvation. The period of adolescence is critical in the religious and cultural development of the child because at this time the child enters gradually into the fullness of Amish life, is given responsibilities which would be directly interfered with if he were compelled to go to high school, and accepts adult baptism. Thus, the Amish religion requires the avoidance of worldly educational environment and imposes the duty on the adolescent to become mature in a wisdom different from what others may regard as wisdom and in skills and responsibilities which are proper and fitting for a life different from what others may wish to pursue. To the Amish, how long a child should attend a formal school is a religious question.

This court does not evaluate, and in fact is prohibited from evaluating, a religious belief for ecclesiastical purposes. *Abington School Dist. v. Schempp* (1963), 374 U. S. 203, 83 Sup. Ct. 1560, 10 L. Ed. 2d 844; *Presbyterian Church v. Hull Church* (1969), 393 U. S. 440, 89 Sup. Ct. 601, 21 L. Ed. 2d 658. Irrelevant, too, is this court's opinion, if it has one, of the validity, the reasonableness, or the merits of the Amish religious beliefs.

The state's argument that the appellants' refusal to obey the compulsory school law is no part of their worship but merely a practice or a way of life cannot be accepted. The free exercise clause is not restricted in its protection to formal ritualistic acts of worship com-

mon in theistic religions but also includes the practice or the exercise of religion which is binding in conscience. *See Sherbert v. Verner, supra,* and *In re Jenison* (1963), 265 Minn. 96, 120 N. W. 2d 515; (1963), 375 U. S. 14, 84 Sup. Ct. 63, 11 L. Ed. 2d 39; (1963), 267 Minn. 136, 125 N. W. 2d 588. There is no question that, as found by the trial court, the compulsory education law infringes upon the free exercise of religion by the appellants within the scope of the protection of the first amendment.

## *The weighing of conflicting interests.*

### (A)   The burden on the constitutional right.

In balancing the competing factors to find the justification of the compulsory school law, we must first examine the burden caused by its interference with the free exercise of the appellants' religion. How heavy is the burden? We think it is clear the burden of compulsory education is a heavy one. The law commands the appellants to perform affirmative acts which are repugnant to their religion. To the Amish, secondary schools not only teach an unacceptable value system but they also seek to integrate ethnic groups into a homogenized society, resulting in a psychological alienation of Amish children from their parents and great harm to the child. The law also places a choice upon each of these fathers to either obey its commands and risk the loss of his salvation or to disobey the law and invite criminal sanctions. The sincerity of the appellants in their beliefs and in their religion cannot be questioned; such sincerity was stipulated in the record.

The impact on the Amish of compulsory education laws is so severe that in other states where they were required to send their children to public schools, they sold their farms and sought religious freedom elsewhere. Some of the Amish in Wisconsin were the victims of

daily fines which became so severe that they were suspended by the governor of Iowa and they sought religious freedom here, in a spirit and with a hope not unlike the Pilgrim Fathers who came to America. *See Clippings: Relation of religion to secular society: Separation of church and state: Church organization and membership,* Wisconsin Legislative Reference Library. When the Amish can no longer move, the impact may result in the extermination of their religious community.

There is another impact on the Amish children themselves if they are required to go to high school. They would experience a useless anguish of living in two worlds. Either the education they receive in the public school is irrelevant to their lives as members of the Old Order Amish or these secondary school values will make life as Amish impossible. At the trial, one of the children testified she did not want to go to high school. Since the children are not being sued as truants, we do not reach the question of whether they have an independent right of the free exercise of their religion to be protected here. We view this case as involving solely a parent's right of religious freedom to bring up his children as he believes God dictates.·

### (B)   Compelling state interest.

On the other side of the scale we have compulsory education which in itself is not a compelling interest although it is within the state power to regulate. It is not sufficient for the state to show a regulation as a direct relation to a policy goal. A compelling interest is not just a general interest in the subject matter but the need to apply the regulation without exception to attain the purposes and objectives of the legislation.

Compulsory education in the United States began in 1642 [5] and in this state in 1889. The two Wisconsin

---

[5] Note, *The Amish and Compulsory Education,* 53 Va. L. Rev. (1967), 925, 930.

cases [6] which have considered our compulsory school law add little to the issue because neither involves any claim of exemption based upon a religious right.

General interest in education was expressed in *Meyer v. Nebraska* (1923), 262 U. S. 390, 400, 43 Sup. Ct. 625, 67 L. Ed. 1042, when the court said, "The American people have always regarded education and acquisition of knowledge as matters of supreme importance which should be diligently promoted." In *Brown v. Board of Education* (1954), 347 U. S. 483, 493, 74 Sup. Ct. 686, 98 L. Ed. 873, the court noted that education was required in the performance of our public responsibilities and was the foundation of good citizenship; it was the principal instrument in awakening the child to cultural values, in preparing him for later professional training, and helping him to adjust normally to his environment.

The Amish point out that the education talked about in these cases is for a world which is not theirs; that their cultural values are different; that their life requires no professional training and that two years of high school education does not help Amish children to adjust normally to their Amish environment. The Amish claim, with compelling merit, that their education produces as good a product as two additional years' compulsory high school education does.[7]

---

[6] *State v. Freudenberg* (1917), 166 Wis. 35, 163 N. W. 184; *In re Alley* (1921), 174 Wis. 85, 182 N. W. 360.

[7] Defense witness Wilbur E. Deininger, sheriff of Green county from 1963 to 1967, undersheriff in 1967 and 1968, and a present member of the city of Monroe department of police, testified that, to his knowledge, no teenage member of the Old Order Amish group dwelling in Green county had ever been apprehended or arrested for crime or engaged in acts of violence.

Defense witness Ray F. Kaskey, for the past nine years director of the department of social services for Green county, testified he knew of no Amish in the county who had been recipients of public assistance, had been unemployed or received unemployment compensation, had illegitimate births, been residents of publicly supported homes for the aged, the indigent, the

The state argues that in its capacity of *parens patriae* it can regulate children when it might be unreasonable to apply such restraints to adults. This is true but there are constitutional limitations on the doctrine of *parens patriae*. Here, the state has substituted its judgment of the type of education for the judgment of the natural parent and has made no allowance for the religion of the child or the religion of the parent. The doctrine of *parens patriae* as applied to juvenile-court procedure has recently received a setback in *In re Gault* (1967), 387 U. S. 1, 87 Sup. Ct. 1428, 18 L. Ed. 2d 527, where a child's right to counsel was held supreme over the benign protection of the state.

In the important matter of freedom of religion, the natural parents should have the right to rear their children in their religion, especially as here, where the parents are in agreement and the tenets of their religion require them to render such upbringing. When a child reaches the age of judgment, he can choose for himself his religion, but prior to that time the state in its capacity of *parens patriae* ought not to enforce educational requirements which will directly influence or destroy that choice. Nor is this harm to the Amish justified because on speculation some Amish children may after reaching adulthood leave their religion. To force a worldly education on all Amish children, the majority of whom do not want or need it, in order to confer a dubious benefit on the few who might later reject their religion is not a compelling interest.

The state relies on *Prince v. Massachusetts* (1944), 321 U. S. 158, 64 Sup. Ct. 438, 88 L. Ed. 645, for its justification to regulate the affairs of children. But *Prince,*

physically or mentally ill, or alcoholics. He further stated the Amish people did not add to the social burdens which the taxpayers of Green county must bear, and that the fact the Amish children do not attend high school has no effect in adding to the social burdens carried by these taxpayers.

while involving a child labor law, was more concerned with public safety. In *Prince,* the defendant (a Jehovah Witness) was convicted of allowing a nine-year-old child to sell religious magazines on a public street corner in the evening. While a religious claim was asserted and a weighing analysis made, the court found the public interest was compelling. This holding is not persuasive in this sensitive area where each case must be evaluated on its facts. Since the same court does not decide all the cases, there is bound to be a difference of opinion.

Thus in *Sherbert v. Verner, supra,* the court held a Seventh-Day Adventist could not be denied unemployment compensation benefits by South Carolina because she refused to work on Saturday, her Sabbath. The purpose underlying the denial of unemployment compensation was not a compelling reason and did not justify the placement of a substantial burden upon a religious right. The purpose of the denial, *i.e.,* not to foster indolence, was not defeated by a religious exception. Furthermore, the legislation required, as in the instant case, an act forbidden by religion. Thus, the court found a constitutional exception for Sabbatarians from the South Carolina law. In *People v. Woody* (1964), 61 Cal. 2d 716, 394 Pac. 2d 813, the California Supreme Court made an exception for the use of a narcotic, peyote, which was used by the Native American Church in its ritualistic worship. The court considered the small use for a religious purpose not to be subversive of the underlying purpose of the narcotic laws to protect public health and the impact of the restriction on religion to be great.

*Sherbert* requires us to ask whether an exemption of the compulsory education law for the Amish would defeat the purpose of compulsory education. We think not. If the purpose of the law is to enable one to perform his public duties, then there is precedent for an exception. The court in *In re Jenison* (1963), 265 Minn. 96, 120 N. W. 2d 515; (1963), 375 U. S. 14, 84 Sup. Ct. 63, 11

L. Ed. 2d 39; (1963), 267 Minn. 136, 125 N. W. 2d 588, on remand from the United States Supreme Court for reconsideration in the light of *Sherbert,* found an exception from jury service for a person whose religion would not allow her to judge others. Here, the public duty of jury service, like the instant case, required an affirmative act contrary to religious conscience. The court found no great impact on the jury system by an exception. The exemption recognizing the religious interest was an accommodation to effectuate the guarantee of the free exercise clause.

Likewise, in the flag-salute cases, *Board of Education v. Barnette* (1943), 319 U. S. 624, 63 Sup. Ct. 1178, 87 L. Ed. 1628, an exemption was found to a requirement to perform an affirmative act which was contrary to religious belief but in fulfillment of the duties of a citizen. As in the jury case, no catastrophe would result from the exemption, nor would any great harm result to the person involved or to others from the exemption. The impact of such an exemption was slight on the underlying purposes and objectives of the state regulation to foster good citizenship.

We recognize where harm from the granting of an exemption will result either to the person involved or to others, and where the act required, although against religious beliefs, is passive in nature, some courts have found the state's interest to be paramount or compelling. Generally, such acts have not interfered directly with acts of sacramental worship or seriously with the exercise of one's faith. Thus, vaccination was required in *Cude v. State* (1964), 237 Ark. 927, 377 S. W. 2d 816, and the blood transfusions in *Application of President & Directors of Georgetown College, Inc.* (D. C. Cir. 1964), 331 Fed. 2d 1000, certiorari denied 377 U. S. 978, 84 Sup. Ct. 1883, 12 L. Ed. 2d 746. But to the contrary, see *In re Estate of Brooks* (1965), 32 Ill. 2d 361, 205 N. E. 2d 435. It is not claimed by the Amish that the government

cannot reasonably regulate some acts religiously motivated, but they point out that compulsory education in its effect on the Amish religion is far more harmful than the effects of vaccination or a blood transfusion was on religion.

We think it is even less possible to assert a spurious claim for exemption under this case than under *Sherbert*. Claims for such an exemption can easily be detected because of the uniqueness of the Amish people. Nor is there merit in the state's argument that its administrative expense and inconvenience of an exemption should be avoided. Here, the state is put to no expense by the exemption. True, Green county may lose a few dollars in state aid but this amount can hardly be the basis of a compelling state interest.

Granting an exception from compulsory education to the Amish will do no more to the ultimate goal of education than to dent the symmetry of the design of enforcement. The right to the free exercise of one's religion under the first amendment should be accorded as much protection as the other first amendment guarantees of free speech and freedom of the press. In those cases the nature of the right is accorded great weight against governmental regulation. The right to worship your God or to practice your religious beliefs are as important as the right to speak or print freely and may, to the individual involved, be more important.

*Establishment clause.*

In granting the exemption in *Sherbert* to the Seventh-Day Adventist, the court stated its decision was not fostering the establishment of the Seventh-Day Adventist religion in South Carolina but "reflects nothing more than the governmental obligation of neutrality in the face of religious differences." This is the answer to the state's argument that to recognize an exemption for the

Amish would violate the establishment clause. This case does not involve the establishment clause and the state misconceives the doctrines of neutrality and accommodation. Authorities now recognize the free exercise clause and the establishment clause overlap, can conflict, and cannot always be squared on any strict theory of neutrality. *See Abington School Dist. v. Schempp, supra.* The "free exercise neutrality" may require a state to make special provisions for religious interests in order to relieve them from both direct and indirect burdens placed on the free exercise of religion by increased governmental regulations.[8] This principle of neutrality is exemplified by the *Sherbert, Woody,* and *Jenison Cases.* As was recently said in *Walz v. Tax Commission* (1970), 397 U. S. 664, 668, at p. 669, 90 Sup. Ct. 1409, 25 L. Ed. 2d 697, which held tax exemption of religious property was constitutional:

"The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

"Each value judgment under the Religion Clauses must therefore turn on whether particular acts in ques-

---

[8] *See:* Katz, *Freedom of Religion and State Neutrality,* 20 U. Chi. L. Rev. (1953), 426; and Religion and American Constitutions (1964); Kauper, *Prayer, Public Schools and the Supreme Court,* 61 Mich. L. Rev. (1963), 1031; Kauper, *Schempp and Sherbert: Studies in Neutrality and Accommodation,* 1963 Religion and The Public Order 3, 29. *See also: Braunfeld v. Brown* (1961), 366 U. S. 599, 608, 81 Sup. Ct. 1144, 6 L. Ed. 2d 563, where the court said that statutory exemption for Sabbatarians from Sunday closing laws would be permissible.

tion are intended to establish or interfere with religious beliefs and practices or have the effect of doing so."

See also: Board of Education v. Allen (1968), 392 U. S. 236, 88 Sup. Ct. 1923, 20 L. Ed. 2d 1060.

### Other cases involving the Amish.

The three cases involving compulsory education and the Amish in other states have denied religious freedom but they are not controlling or persuasive. These are State v. Hershberger (1955), 103 Ohio App. 188, 144 N. E. 2d 693; Commonwealth v. Beiler (1951), 168 Pa. Super. 462, 79 Atl. 2d 134; and State v. Garber (1966), 197 Kan. 567, 419 Pac. 2d 896, certiorari denied, 389 U. S. 51, 88 Sup. Ct. 236, 19 L. Ed. 2d 50. Two of these cases, Hershberger and Beiler, were decided before Sherbert and rely heavily on the dubious distinction between religious belief and religious conduct. See Cantwell v. Connecticut (1940), 310 U. S. 296, 60 Sup. Ct. 900, 84 L. Ed. 1213. Thus the court in Hershberger reasoned that requiring the Amish to provide an education for their children would not abridge their right to worship, concluding therefrom that no question of infringement of religious freedom was involved. In light of Sherbert, the validity of such reasoning is to be doubted since the guarantee of free exercise of religion covers more than sacramental acts of worship.

In Beiler the court gave recognition to the conflict between compulsory education and religious liberty but having drawn the balance, proceeded to mechanically add to the state's side a series of cases upholding a restriction on religious conduct.[9] No analysis in those cases was

[9] Reynolds v. United States (1878), 98 U. S. 145, 25 L. Ed. 244 (polygamy); Stansbury v. Marks (1793), 2 U. S. (2 Dallas) 213, 1 L. Ed. 353 (conviction of a person of the Jewish faith who refused to be judicially sworn on a Saturday); Hamilton v. Regents (1934), 293 U. S. 245, 55 Sup. Ct. 197, 79 L. Ed. 343 (military training at state university); and Prince v. Massachusetts, supra.

made of the relative importance of the religious beliefs in issue or of the degree to which enforcement of the law infringed upon those beliefs. Nor did the court consider the effectiveness of the regulatory purpose or the practicability of an exemption. The type of an analysis used does not satisfy today's standards in dealing with constitutional questions. It is also significant that the *Beiler* decision has been modified by the Pennsylvania legislature.[10]

In *State v. Garber*, the Kansas court considering the problem after *Sherbert*, held that the law was to be enforced against the Amish. The appellants' contention that *Garber* reflects an insensitive consideration of the Amish religion is in part supported by a reading of the opinion. *Garber* followed the *Beiler* court's mechanical separation of religious conduct from religious belief, implying that the constitutional protection is afforded only to beliefs connected to the act of worship and held that since the compulsory attendance laws do not directly affect Amish worship, there was no abridgement of their religious freedom. But the Amish do not have a ritualistic form of worship. They have no churches as such. Their life style is dictated rather than motivated by their religion. The narrowness of the *Garber* concept of the scope of protection afforded by the free exercise clause renders the case unpersuasive.

---

[10] Note: 53 Va. L. Rev. (1967), 925, 951, describes the Pennsylvania plan which provides for the operation of day schools by church groups offering schoolwork programs to those fourteen and older who have completed the eighth grade. Each student spends no less than three hours a week in the "school" studying such subjects as English, mathematics, health and social studies, supplemented by outside agricultural and domestic projects. The note concludes "since perhaps the principal legitimate goal of compulsory education is to insure that children become useful and productive adults, and that they will not prove so dysfunctional as to become wards of the state," these "schools" ought to be as satisfactory as their trade school counterparts in urban communities.

*Garber* has also lost luster because an exemption was provided in 1968 by the Kansas legislature. Kan. Stat. Annot., sec. 72–1111 (1968 Supp.). This exemption enables the Amish to comply with the Kansas law with its unique educational program. These legislative exemptions evince the fact the important goals of education can be attained by alternative forms of regulation without infringing first amendment rights.

We conclude that although education is a subject within the constitutional power of the state to regulate, there is not such a compelling state interest in two years' high school compulsory education as will justify the burden it places upon the appellants' free exercise of their religion. Therefore, the Wisconsin Compulsory School Attendance Law, sec. 118.15, Stats., is unconstitutional as applied to these Amish appellants, and the convictions must be reversed. If in the future the facts are such that the effectiveness of the compulsory education law will be seriously jeopardized by this exemption, we reserve the right to re-examine the question.

*By the Court.*—Judgments reversed.

CONNOR T. HANSEN, J. (*concurring*). I concur with the result reached in the opinion written by Mr. Chief Justice HALLOWS, but only to the extent that children of members of the Old Order Amish religion or Conservative Amish Mennonite Church, living as members of the Amish community, should not be required to attend a school which meets the requirements of state law beyond the eighth grade.

Under the facts of this case, there has been an inadequate showing that the state's interest in establishing and maintaining an educational system overrides the defendants' right to the free exercise of their religion. Consequently, I would hold that unless and until further experience indicates that so invoking the first amendment poses a serious threat to the effective functioning

of an educational system within the state, children of members of the religious order involved in this case should not be required to attend school beyond the eighth grade.

I am authorized to state that Justices WILKIE, BEIL-FUSS, HANLEY and ROBERT W. HANSEN, join in this concurring opinion.

HEFFERNAN, J. (*dissenting*). The principal opinion reaches an erroneous conclusion based upon questionable reasoning and a misstatement of the facts. Contrary to the implication of the opinion writer, the Amish were not prosecuted for failing to send their children to a public high school. They were prosecuted for violation of sec. 118.15(1), Stats., which requires attendance at school, whether public or *private,* until the end of the school period in which the child attains sixteen years of age. The distinction is important and is crucial to this dissent. The principal opinion rests in part upon the misconception that the defendants' only alternative to criminality is *public* school attendance for their children. Such is not the case. The law makes no such requirement.

The reasoning is faulty, for it conceives the problem as one of religious liberty alone. It completely ignores the personal liberty of the Amish children to avail themselves of educational opportunities beyond eighth grade. In addition, the freedom of these young people to make a religious choice is completely ignored.

That opinion states:

"Since the children are not being sued as truants, we do not reach the question of whether they have an independent right of the free exercise of *their* religion to be protected here. We view this case as involving solely a parent's right of religious freedom to bring up his children as he believes God dictates." (Emphasis supplied.)

This, of course, is the easy way out. It keeps intact the opinion's oversimplification of the problem and avoids completely the difficult question of the court's responsibility to see that the legislative mandate of universal education is carried out. It purports to strike a blow for religious liberty, but in so doing, it does little for religion and impinges upon personal liberty.

The principal opinion solves the balancing of religious interests with equal ease. Having once set up the postulate that the free exercise of religion cannot be impinged upon by the state unless there is a compelling state interest in the regulation, the syllogism is completed by the unsupported assertion that "compulsory education . . . is not a compelling interest although it is within the state power to regulate."

That assertion is contrary to a reasonable view of accepted law. *Brown v. Board of Education* (1954), 347 U. S. 483, 74 Sup. Ct. 686, 98 L. Ed. 873, stated:

"Today, education is perhaps the most important function of state and local governments. Compulsory school attendance laws and the great expenditures for education both demonstrate our recognition of the importance of education to our democratic society. It is required in the performance of our most basic public responsibilities, even service in the armed forces. It is the very foundation of good citizenship. Today it is a principal instrument in awakening the child to cultural values, in preparing him for later professional training, and in helping him to adjust normally to his environment. In these days, it is doubtful that any child may reasonably be expected to succeed in life if he is denied the opportunity of an education."

What could be a more compelling state interest than "the most important function of state and local governments."

The very organic act that first set up a political structure for the territory that is now Wisconsin emphasized the compelling public interest in education. Article III, Northwest Ordinance 1787, provided:

"Religion, morality, and knowledge being necessary to good government and the happiness of mankind, schools and the means of education shall forever be encouraged." 1 Wis. Stats. Anno., p. 740.

Subsequent amendments to the Ordinance provided that the proceeds of public lands were to be used for seminaries of learning. The enabling act under which Congress authorized the organization of this state directed that section 16 of every township should be granted to the state for school purposes.

Education has been a prime and compelling interest of this state since its very beginning.

This, of course, does not completely answer the question of whether the compelling interest of the state should be paramount to the obviously sincere belief of the Amish elders that school attendance ought not be compelled beyond a grade-school level. On one hand we find a legislative mandate of unquestionable compelling state interest—that all children attend school until the age of sixteen—and, on the other, a constitutional mandate that there shall be no state law that prohibits the free exercise of religion.

A court ought not to make a choice favoring either the particular interest of church or state unless an irreconcilable conflict exists. Thomas Jefferson could not foresee that such conflicts could ever exist. He stated in his reply to an address of the Danbury Baptist Association in reference to the recently proposed freedom of religion amendment to the constitution:

"Adhering to this expression of the supreme will of the nation in behalf of the rights of conscience, I shall see with sincere satisfaction the progress of those sentiments which tend to restore man to all his natural rights, convinced he has no natural right in opposition to his social duties." *Reynolds v. United States* (1878), 98 U. S. 164, 25 L. Ed. 244.

While Jefferson's words express a hope rather than a realization, the lesson is clear: Conflicts between church

and state, *i.e.*, between man's natural right of religious choice and his duty to his organized society, ought to be reconciled where possible, and judicial fiats declaring legislative enactments unconstitutional ought to be avoided except in the clearest of cases and where all reasonable alternatives have been exhausted.

The principal opinion would also hold that the state has no compelling interest in a regulatory measure unless it has a "need to apply the regulation without exception to attain the purposes and objectives of the legislation." The argument, therefore, seems to be that to grant an exemption for such a small group as the Wisconsin Amish would have no effect upon the general policy of the state to further education, and the diminution of Amish children's education by two years is so insignificant as to be *de minimis*.

This argument misconceives the nature of the state's compelling interest in education. The purpose of education is not alone to provide a mass of educated and, hence, taxable citizens, but is, in addition, intended to educate the individual for life. The government's concern is not with enforcing a regulatory scheme. Rather, the concern is based upon the precepts stated in the Northwest Ordinance, *supra*, that religion, morality, good government, and happiness are all dependent upon education. This is the compelling government interest.

This difficult problem cannot be dismissed as *de minimis*.

The state's interest and obligation runs to each and every child in the state. In the context of the public law of the state, no child's education is below the concern of the law. The principal opinion bolsters the *de minimis* argument by making the unsupported tacit assumption that all or most of the Amish children will forever remain in their communities. This is not necessarily a fact. Large numbers of young people voluntarily leave the Amish community each year and are thereafter forced to make their way in the world.

Those young Amish who leave the group have received no education that equips them for modern American life. By not enforcing the school attendance law, the state of Wisconsin has consigned these young people to a future without any choice or goal except those of the traditional Amish life. They are abandoned without the intellectual tools to survive should they elect to leave the Amish way of life.

The traditional Amish life has its attractions, but ought this court, by depriving Amish children of all but a bare eighth grade education, block for all time all other avenues for them. This is the effect of this decision. On the basis of the religious beliefs of their parents, the Amish children are without a hearing [1] consigned to a life of ignorance—blissful as it may seem to the author of the principal opinion, who apparently views the Amish as "the noble savage," uncorrupted by the world. The reader is left with a picture of idyllic agrarianism. Unmentioned is the tragic side of Amish life: "Drinking . . . has become problematic" (Hostetler, *Amish Society*, p. 282) ; "Rowdyism and stress" (p. 281) ; "Preoccupation with filthy stories" (p. 282) ; "Drinking is common in all large Amish settlements" (p. 283) ; "It would appear that among the Amish the rate of suicide is just as high, if not higher, than for the nation." It is highest among young men (p. 300). Amish society is perhaps but another miscrocosm of society—some of it is good and some bad. It is a cross-section of good and evil influences that pervade any society. But the children's

---

[1] With our ostensible solicitude for the fate of children who are in other legal situations affected by conduct of their parents, it is surprising that no guardian *ad litem* was appointed to represent these children's interest. While the religious beliefs of the parents are at stake in this lawsuit, it is apparent that the children's interest is of equal importance. Reason dictates that representation by a guardian *ad litem* was a *sine qua non* of the majority's result.

denial of education ought not be justified on the mythological basis assumed by the principal opinion.

The above descriptions apply to Amish society generally and are not specifically descriptive of the Amish community involved in this case. The source, Hostetler, *Amish Society,* is the one relied upon by the majority.

It is apparent, however, that the problem of having these "peculiar people" [2] in our society ought not be solved by fining them or sending them to jail if they choose not to conform to the usual religious mores of the state. While the record in this case is incomplete, it reveals a complete lack of any attempt by local or state officials to deal realistically or imaginatively with a difficult problem. In fact, there is strong evidence that the purpose of this prosecution was not to further the compelling interest of the state in education, but rather the reprehensible objective, under the facts of this case, to force the Amish into the school only for the purpose of qualifying for augmented state aids.

The points of view, however, are clearly reconcilable. The law requires that all children attend school until they are sixteen. The Amish object to the worldliness of the usual high school. The writer of this dissent believes that both objections can be met by an Amish vocational school which will teach reading, agriculture, and husbandry, and whatever religious precepts the Amish community desires.

In addition, such basic skills as English and mathematics should be taught—"unpretentious" knowledge that will be useful not only in the Amish community, but would better enable those who fall away from the community to adjust to the outside world and to continue their education if they so desire.

Such plans have been adopted in Pennsylvania, Ohio, and Iowa, usually only after gestapo tactics by school

---

[2] Deuteronomy, ch. 26, verse 18; Titus, ch. 2, verse 14.

authorities outraged the non-Amish community into reaching reasonable alternatives. In Iowa, only the intervention of Governor Harold Hughes brought rationality and compassion to a reconciliation of the problem. The Pennsylvania plan offers schoolwork programs to Amish fourteen years or older who have completed eighth grade. In addition to classwork in English, mathematics, and hygiene, they are required to develop domestic and agricultural skills. In Iowa, schooling is required, but Amish schools need not meet the public school curriculum standards. A similar practice is followed in Maryland. In Indiana, Amish are encouraged by the state superintendent of schools to organize their own schools.

Hostetler [3] points out that the enforcement of school attendance laws has resulted in the "professionalization" of Amish schools and that, as a consequence, nearly 200 Amish elementary schools and 50 Amish vocational schools (for post-fourteen-year-old students) were in operation in 1967. The plans recognize that Amish children will be better suited for the Amish way of life if they are educated to be productive members of the Amish community. They also recognize the state's interest in education that will serve the children if they leave the community.

The alternatives, therefore, are not those that are posed in the principal opinion. Compulsory education until age sixteen is not necessarily "worldly" education. No part of our law requires a student to go to a school not of his own religious choice. It merely requires that he go to a school. There is no reason why the Amish community should not establish its own school—as the Amish have in other states—that will foster the Amish way of life. They may not, however, ignore the com-

---

[3] This discussion of these alternatives relies largely on Hostetler, *supra*, pp. 193–203.

pelling interest of the state in educating their children. They may do as other religious organizations have done and establish their own schools and teach them basic skills and the precepts of their own religious beliefs and be in conformance with the law. Until they do so, they are subject to criminal penalties.

Neither the prosecutorial tactics of the school authorities nor the insensitivity of the principal opinion to the educational policies of the state and the personal liberties of these children are appropriate to the problem faced by the Amish.

Contrary to the conclusions of the opinion subscribed to by the majority of the court and authored by Mr. Justice CONNOR T. HANSEN, I am satisfied that the state's compelling interest in universal education has been abundantly demonstrated.

I would affirm, but would stay execution of sentence for such period of time as is reasonably required to properly organize and to commence operation of an Amish vocational school. At the commencement of such operations, the judgment should be vacated and the complaint dismissed.