STATE, Plaintiff-Respondent, v. KASUBOSKI, and wife, Defendants-Appellants.†

Court of Appeals

*No. 77–342–CR. Argued November 30, 1978.—Decided December 20, 1978*
(Also reported in 275 N.W.2d 101.)

† Petition to review denied.

408

For the appellants the cause was submitted on the brief of *Charles* and *Mary Ann Kasuboski* of Omro with oral argument by *Charles Kasuboski*, Pro Se.

For the respondent the cause was argued by *William L. Gansner*, assistant attorney general, with whom on the brief was *Bronson C. La Follette*, attorney general.

Before Moser, P.J., Brown and Bode, JJ.

MOSER, P.J.   This appeal is from the circuit court's order affirming the orders and judgment of conviction

entered by the Winnebago County Court, Thomas S. Williams presiding.

Charles and Mary Ann Kasuboski (Kasuboskis) were charged on September 30, 1976 with failure to cause their eight children[1] to attend public or private school contrary to sec. 118.15(1)(a), Stats. The Kasuboskis, who are members and ministers of the Life Science Church (church), claimed to have withdrawn their children from the Omro public school system for religious reasons. The church is an unincorporated affiliate of the Basic Bible Church, a nonprofit Minnesota corporation.

On November 10, 1976, the Kasuboskis moved to dismiss the complaint on the ground that application of the compulsory school attendance statute to them violated their constitutional right to freedom of religion. They also moved to have Jerome Daly, president of the church, a trustee and minister of the Basic Bible Church, and a disbarred attorney,[2] represent them as their defense counsel. Both motions were denied, but Daly and several others were allowed to sit at the counsel table and assist the Kasuboskis.

A jury trial was held on December 6 and 7, 1976. Before the jury was selected, the court heard testimony on a renewed motion to dismiss on constitutional grounds. The testimony established that church members do not live apart from society and that the church's fundamental principles were contained in the Bible, the Declaration of Independence, and the federal constitution, except for the sixteenth amendment and the use of paper money.[3]

---

[1] At the time of trial, the names and ages of the children were: Lois, 15; Roberta, 14; Michael, 13; Ronald, 11; Susan, 10; Charlotte, 9; Roger, 8; and Sandra, 7.

[2] The Kasuboskis admit his disbarment on page 23 of their brief.

[3] Reference was also made to the twenty-fifth amendment, but there was no elaboration of why the church would be opposed to the procedures for replacing disabled presidents and filling vacancies in the vice presidency.

The witnesses were Jerome Daly, Charles Dodge, overseer of church activities for that part of Wisconsin, and Sherri Graf, a minister in the church from Omro. All of the witnesses agreed that the church was not opposed to education *per se* and that parents had a responsibility to see that their children were properly educated. They acknowledged that some members of the church sent their children to public schools. Those members were not scorned, shunned, or ostracized by others in the church. Neither those members nor their children were deemed to be sinners for attending public schools. Daly had issued a letter in August of 1976, urging parents to withdraw their children from public schools and teach them in church supported schools. There were no sanctions imposed on those who disregarded the directive, and Daly admitted that the order was issued solely under his authority and was not a tenet of the church.

The church's charter requires its members to reject the "communistic principle" that the individual exists for the sake of the state and to adhere to the "capitalistic principle" that the individual exists for the sake of himself, his family, and those he chooses to serve. The Confession of Faith of the Basic Bible Church states that "the Anglo-Saxons are Israel . . . the sons of the living God." Graf testified that the church was opposed to racial integration and the teaching of humanism, racial equality, and "one-world government." Dodge also testified that the church opposed racial integration and the teaching of communism, sex, humanism, and one-world government. Both felt that the public schools taught such things, although neither had investigated the Omro public schools beyond reports made by others and the attitudes the children began to display.

The church charters "auxiliary churches" which are free to make up fundamental beliefs and tenets that fit their particular situation so long as they don't conflict

with the tenets of the church. Thus, Daly and Dodge agreed that, while the church is not anti-Semitic, an auxiliary church could require the withdrawal of children from public schools because of Jewish influences. All three witnesses agreed that the church left it to the individual consciences of the members to decide whether to withdraw children from the public schools. The Kasuboskis have an auxiliary church which forbids attendance at Omro public schools because the schools teach humanism and racial equality and are influenced by communists and Jews. It is not clear whether there are any members of this auxiliary church other than the Kasuboskis.

At the conclusion of this testimony, the trial court again denied the motion to dismiss. A jury was selected, and it returned a verdict of guilty after hearing testimony that the Kasuboski children were not attending the public schools in their district and that truancy notices had been served. The Kasuboskis did not present evidence on an affirmative defense of attendance at an adequate private school. The trial court entered a judgment of conviction; denied motions for judgment notwithstanding the verdict or a new trial, and withheld sentence pending the preparation of a presentence report.

In the meantime, the Kasuboskis filed a notice of appeal to the circuit court, suspending the trial court's jurisdiction. The circuit court affirmed the convictions on July 12, 1977. Ten days later the Kasuboskis filed a notice of appeal to the supreme court again suspending the trial court's jurisdiction. Thus, sentence was never imposed by the trial court. Nevertheless, the supreme court denied the State's motion to dismiss for lack of an appealable order[4] and transferred the matter to this court.[5]

---

[4] *State v. Kasuboski*, 83 Wis.2d 909, 266 N.W.2d 433 (1978).

[5] Supreme Court order dated June 29, 1978 pursuant to ch. 187, §131, 1977 Wis. Laws.

Additional facts will be stated in the opinion as needed.

The issues, presented are: (1) whether the application of sec. 118.15, Stats., to the Kasuboskis violated their constitutional right to freedom of religion and (2) whether the trial court erred in denying the Kasuboskis' motion to allow someone who was not a member of the bar to act as their defense counsel.

## CONSTITUTIONAL APPLICATION OF SECTION 118.15

Both parties acknowledge that this question is controlled by the decisions in *State v. Yoder*[6] and *Wisconsin v. Yoder*.[7] In those decisions, the Wisconsin Supreme Court and the United States Supreme Court held that sec. 118.15, Stats., could not be constitutionally applied to Amish parents who refused to send their children to either public or private high schools. The courts held that the State's interest in education could not overcome the parents' right to practice their religious beliefs without government interference.

The Amish are followers of Ammann who dedicate themselves to maintaining the old practices and resist any capitulation to the sin of worldliness. The rules of conduct of the Amish religion in its folk culture context are incorporated in the Ordnung of each community but ordinarily are not articulated and codified in writing. The Ordnung is enforced by sanctions of excommunication and shunning. The tenets of the Amish religion require a church community separate from the world as part of an individual's way of salvation. Amish children attend elementary public schools where no private Amish elementary school is available. Amish religion dictates that the Amish children live according to the mode of life

---

[6] 49 Wis.2d 430, 182 N.W.2d 539 (1971).

[7] 406 U.S. 205 (1972).

of the Amish community from the inception of adolescence. They believe that any high school, public or private, constitutes a detriment to the child's salvation because secondary education exposes Amish children to a worldly influence in conflict with their beliefs. It is part of the Amish religious custom to have adolescents give their full attention to preparation for their eventual responsibilities in the adult community. Thus, to the Amish, how long a child should attend school is a religious question.[8]

By contrast, the tenets of the Basic Bible Church and the Life Science Church do not forbid education beyond a certain level. It was acknowledged that many church members in the Omro area sent their children to the public schools and those members were not scorned, shunned, or ostracized as a result. Attendance at public schools was said to be a matter of conscience for individual members. Church members do not live in separate communities; they live amongst the general population in the areas where the church exists.

The record reflects that it is only the auxiliary church operated by the Kasuboskis that has taken action to withdraw children from the Omro school district. The Kasuboskis refused to enroll their children in the respective elementary, middle, and high school of the Omro school district. The Kasuboskis did so because the teaching in the Omro schools conflicts with the religious teaching of the church. The witnesses testified that the public schools taught communism, humanism, and racial equality rather than white supremacy. The public schools were said to have a Jewish influence and involved bussing, although desegregation is not an issue within the Omro school district. Thus, the Kasuboskis object to the idealogical content of education in public

[8] *Id.* at 209–13; *State v. Yoder*, 49 Wis.2d at 434–36, 182 N.W.2d at 540–41.

schools rather than any kind of education beyond a certain age.

The State has the power to impose reasonable regulations for the control and duration of basic education.[9] That power, however, is not totally free from a balancing process when it impinges on fundamental rights and interests such as those protected by the free exercise clause of the first amendment and the traditional interests of parents with respect to the religious upbringing of their children.[10] Where first amendment freedoms are being infringed upon, the State must show a compelling interest before it may enforce its compulsory education statute.[11] No mere showing of a rational relationship to some colorable state interest will suffice; in the highly sensitive area of religious freedom, only the gravest abuses endangering paramount interests justify state intrusion.[12]

The *Oregon School Case*[13] established the right of parents to send their children to private institutions of learning in spite of a statute mandating education of children in public institutions. This case is a charter for the rights of parents to direct the religious upbringing of their children.[14] However, those parental rights may still be limited if it appears that the parental decisions will jeopardize the health or safety of the children or have a potential for significant social burdens.[15]

[9] *Wisconsin v. Yoder*, 406 U.S. at 213.

[10] *Id.* at 214.

[11] *See N.A.A.C.P. v. Button*, 371 U.S. 415, 438 (1963).

[12] *Sherbert v. Verner*, 374 U.S. 398, 406 (1963).

[13] *Pierce v. Society of the Sisters of the Holy Names of Jesus and Mary*, 268 U.S. 510 (1925).

[14] *Wisconsin v. Yoder*, 406 U.S. at 233.

[15] *Id.* at 233–34.

The parental claims must be rooted in religious belief before they can receive these first amendment protections. A way of life, however virtuous and admirable, may not be interposed as a barrier to reasonable state regulation of education if it is based on purely secular considerations. A determination of what is a "religious" belief or practice entitled to constitutional protection may present a most delicate question. The very concept of ordered liberty, however, precludes every person from following his own standards on matters of conduct in which society as a whole has an important interest. A personal, philosophical choice by parents, rather than a religious choice, does not rise to the level of a first amendment claim of religious expression.[16]

It is obvious that compulsory education is a reasonable state regulation which can be avoided in this case only by a showing that the Kasuboskis' claims are rooted in religious beliefs. No such showing appears in the record. Neither the Basic Bible Church nor its subsidiary, the Life Science Church, has a tenet against education. It is only the auxiliary church operated by the Kasuboskis in their home that has enacted such a tenet.

The Kasuboskis have asked the trial court, the circuit court, and this court to regard the unique standards confined to their auxiliary church as religious beliefs entitled to first amendment protection. The record clearly establishes that the Kasuboskis removed their children from the public schools on the basic of ideological or philosophical beliefs rather than fundamentally religious beliefs. That choice does not rise to the level of religious belief necessary to provide the first amendment protection the Kasuboskis seek. Without this first amendment protection, ordered liberty in Omro and the rest of Wisconsin

[16] *Id.* at 215–16.

precludes the Kasuboskis or any other individuals from making their own standards of conduct.

Acceptance of the Kasuboskis' claim of religious protection would open a door to all who object to part or all of the subject matter being taught in public schools. The possibility of selective withdrawals of children by individual parents from the public schools would effectively destroy the compulsory school system in Wisconsin.

The Amish agreed that education was necessary through the eighth grade and provided vocational training on the family farm which prepared the child for adult life in the Amish community. The State's interest in having informed, self-supporting citizens was thereby protected.[17] The Kasuboskis wish to withdraw their children from all levels of public education. They claim that they are having their children tutored in a private school in their residence.[18] Private schooling is clearly acceptable under the statutory scheme. Unfortunately, this claim finds no support in the record because the Kasuboskis refused to put on a defense without the assistance of Daly as their attorney. Without evidence of private education of the children, we must conclude that the Kasuboskis' decision will have an adverse effect on their children which jeopardizes their children's future in society. Therefore, the trial court correctly concluded that the Kasuboskis had violated sec. 118.15(1)(a), Stats.

## RIGHT TO COUNSEL

The Kasuboskis had a federal constitutional right to be represented by counsel.[19] That right was also secured

---

[17] *Id.* at 221–22.

[18] Brief for Appellants at 14.

[19] *Gideon v. Wainwright*, 372 U.S. 335 (1963).

by the state constitution and statute.[20] The Kasuboskis claim that such "counsel" need not be limited to members of the bar. They assert that the trial court committed reversible error by denying their request to have Daly, a disbarred attorney, represent them. If the right to counsel includes the right to be represented by someone who is not licensed to practice law, the Kasuboskis' right was violated. That right, however, does not extend to non-lawyer representatives.

The Kasuboskis cite the recent United States Supreme Court decision in *Faretta v. California*[21] for the proposition that the sixth amendment[22] reference to "counsel" is not limited to attorneys. That decision merely held that a criminal defendant had the right to represent himself if he chose to waive the right to have an attorney represent him.[23] Therefore, that decision discusses a defendant's right to act as his own lawyer and has nothing to do with the right to have a non-lawyer represent him.

The Kasuboskis also cite the decisions in *United States v. Stockheimer*,[24] *United States v. Peterson*,[25] and *United States v. Whitesel*[26] in support of their position. In *Stockheimer*, the defendant requested to have Daly and Gordon Peterson, president of the Basic Bible Church and another disbarred attorney, represent him in his defense. The court construed the sixth amendment's reference to "counsel" to mean one who is legally trained and qualified to function as an attorney. The court was not prepared to limit the term to those licensed to prac-

---

[20] Wis. Const. art. I, §7; sec. 970.02(1)(b), Stats.

[21] 422 U.S. 806 (1975).

[22] Since it is the sixth amendment right to counsel which has been applied to state prosecutions through the fourteenth amendment's due process clause, all references to the federal right to counsel will be to the sixth amendment.

[23] Wis. Const. art. I, §7 has always given the defendant a right to represent himself.

[24] 385 F. Supp. 979 (W.D. Wis. 1974).

[25] 550 F.2d 379 (7th Cir. 1977).

[26] 543 F.2d 1176 (6th Cir. 1976).

tice by some state, but the court held that neither Daly nor Peterson were sufficiently qualified to be "counsel."[27] The court then exercised its discretion and allowed Peterson to assist the defendant. The court said it was not obliged to accord Peterson the amenities normally given to licensed attorneys and could not protect him from prosecution for the unlicensed practice of law. Thus, *Stockheimer* established that in federal courts a defendant is not *entitled* to have an unqualified person represent him, even though the trial court can allow such representation in its discretion.

The decisions in *Peterson* and *Whitesel* do not advance the Kasuboskis' argument. In *Peterson*, the seventh circuit merely held that Peterson could not be prosecuted in federal court under the Assimilated Crimes Act[28] for violating Wisconsin's prohibition against unlicensed practice of law by representing Stockheimer. The court did not intimate that the sixth amendment gave Stockheimer the right to have Peterson represent him. In *Whitesel*, the sixth circuit affirmed a district court's refusal to allow a taxpayer's accountant to represent him in a tax prosecution. Noting that several federal courts had decided that a defendant is only entitled to an attorney at law,[29] the court observed that at the time of the adoption of the sixth amendment, "counsel" referred to those who were allowed to conduct causes under the rules established by the courts.[30] The court then noted that

[27] 385 F. Supp. at 983.

[28] 18 U.S.C. §13 (1970).

[29] *See United States v. Jordan*, 508 F.2d 750, 753 (7th Cir. 1975) (affirming a denial of a taxpayer's request to have Daly represent him); *United States v. Cooper*, 493 F.2d 473, 474 (5th Cir. 1974); *McKinzie v. Ellis*, 287 F.2d 549, 551 (5th Cir. 1961) (appointment of attorney who had been dropped from state bar for failure to pay membership fees violates due process); *Turner v. American Bar Ass'n*, 407 F. Supp. 451, 477–78 (W.D. Wis. 1975).

[30] 543 F.2d at 1179.

the district court's rules provided that, except in extraordinary cases, only those who had been admitted to the bar of the district court could represent others in actions before the district court. The appellate court found no abuse of discretion in the district court's refusal to treat the matter as such an extraordinary case.[31] We see no reason to interpret the term "counsel" in our constitution any differently from that term as used in the sixth amendment.

Wisconsin has similar rules governing the right to appear in state courts on behalf of another. Only a member of the State Bar of Wisconsin or someone accompanied by a member of the Bar may appear on behalf of another in state courts.[32] It is unlawful for any person not licensed to practice law in this state to appear for,

---

[31] *Id.* at 1180.

[32] The rules of the State Bar provide:

Rule 2. MEMBERSHIP.

Section 1. *Persons included in membership.* The membership of the State Bar initially shall consist of all those persons who on the date when these rules take effect are licensed to practice law in this state, and after these rules take effect shall include also all those persons who become licensed from time to time to practice law in this state; subject in each case to due compliance with the conditions and requirements of membership. Residence in the state of Wisconsin shall not be a condition of eligibility to membership in the State Bar.

. . . .

Section 4. *Only active members may practice law.* No individual other than an enrolled active member of the State Bar shall practice law in this state or in any manner hold himself out as authorized or qualified to practice law. A judge in this state may allow a nonresident counsel to appear in his court and participate in a particular action or proceeding in association with an active member of the State Bar of Wisconsin who appears and participates in such action or proceeding. Permission to such nonresident lawyer can be withdrawn by the judge granting it if such a lawyer by his conduct manifests incompetency to represent a client in a Wisconsin court or his unwillingness to abide by the Code of Professional Responsibility and the Rules of Decorum of the court.

or on behalf of, another in any court of record in this state.[33] The integration of the State Bar, allowing only members to practice before the courts of this state, has been upheld against constitutional challenge.[34] Therefore, the trial court did not err in refusing to allow Daly to act as the Kasuboskis' attorney.

The Kasuboskis were also not denied a fair trial by the trial court's decision. It is perfectly clear from the record that the Kasuboskis made an intelligent waiver of their right to have a member of the Bar represent them. The trial court allowed Daly and several others to sit at the counsel table with the Kasuboskis and advise them. The only restriction placed upon these advisors was that they not address the court or jury in open court[35] and that they behave in an orderly fashion. The record indicates that the Kasuboskis were able to present their arguments on the motion to dismiss through briefs and testimony in court. Their failure to put on a defense once the jury had been selected can only be viewed as a tactical decision to create sympathy within the jury. The failure of that tactic does not entitled them to a new trial in the interests of justice.[36]

*By the Court.*—Judgment and orders affirmed.

State Bar Rules, as amended effective March 15, 1972, 53 Wis.2d at ix–xi. These rules have remained substantially the same since the State Bar was integrated by order of the Wisconsin Supreme Court on December 7, 1956, 273 Wis. vii.

[33] Sec. 256.30(1) and (2), Stats., renumbered to sec. 757.30(1) and (2) by ch. 187, §96, 1977 Wis. Laws.

[34] *Lathrop v. Donohue*, 367 U.S. 820 (1961); *State ex rel. Baker v. County Court*, 29 Wis.2d 1, 138 N.W.2d 162 (1965).

[35] They were allowed to address the court during discussions in chambers.

[36] The Kasuboskis have not requested a new trial in the interests of justice but this court has the authority to order a new trial on its own motion. Sec. 752.35, Stats., created by ch. 187, §112, 1977 Wis. Laws. We decline to exercise that authority in this case.