Sisters Mary Joanne KOLLASCH, Mary David Walgen-
bach, Mary Raphael Hilger, Mary Concepta Tritz,
Mary Philomena Head, Mary Baptista Schlitz, Mary
Camillus VanderVorde, Mary Grace Berzani, Mary
Cora Marie Kessner, Mary Patricia Delaney, Mary
Agatha Bermel, Mary Margaret Mary Finney, Mary
Helen Goebel, Mary Martha Glaser, Mary Joyce
Jungles, Mary Loretta Harvey, Mary Deniella Wal-
genbach, Mary Marian Siedschlag, Mary Sylvia Kim-
berly, and Sisters of St. Benedict of Madison, Wis-
consin, a Wisconsin corporation, Plaintiffs-Appel-
lants,†

v.

David W. ADAMANY, Secretary of the Department of
Revenue, Defendant-Respondent.

Court of Appeals

*No. 79–1579. Argued August 20, 1980.—
Decided November 24, 1980.*
(Also reported in 299 N.W.2d 891.)

† Petition to review granted.
BEILFUSS, C.J., took no part.

536

For the plaintiffs-appellants there were briefs by *Trayton L. Lathrop, Gerald C. Kops, Michael J. Lawton* and *Michael H. Barton* and *Isaksen, Lathrop, Esch, Hart & Clark* and oral argument by *Trayton L. Lathrop.*

For the defendant-respondent there was a brief by *Bronson C. La Follette,* attorney general, and *John E. Armstrong,* assistant attorney general, and oral argument by *John E. Armstrong,* assistant attorney general.

Before Gartzke, P.J., Bablitch, J. and Dykman, J.

DYKMAN, J. The individual plaintiffs in this action are members of a monastic community of Roman Catholic women known as a priory. The sisters make their facilities[1] available to individuals and groups for re-

---

[1] The facilities consist of two buildings located on 135 acres of wooded land: the Center Building and Unity Hall. The Center Building houses a dining hall, an auditorium, six conference rooms, a library, a chapel, and 43 bedrooms. Unity Hall has 33 bedrooms, three conference rooms, two lounges, a kitchen, a chapel, and a large recreation room. The facilities can accommodate over 100

treats or for use as a meeting place. The issue they raise is whether the fee which they charge for meals served to those who visit the premises is subject to Wisconsin's sales tax. In order to decide this issue, we must determine whether the sales tax applies to the sisters' sale of meals, and if so, whether this taxation violates their constitutional right to the free exercise of their religion.

The following facts are taken from the testimony given at a hearing held in Dane County Circuit Court on March 28 and 29, 1978, and from the exhibits which were introduced into evidence at that hearing. The department of revenue (department) made no attempt to contradict or impeach the vast majority of the evidence presented by the sisters at that hearing. Thus, the facts are largely undisputed.

The priory is incorporated under the name "Sisters of St. Benedict of Madison, Wisconsin." The priory is a part of the Federation of St. Gertrude, which in turn is a part of the Benedictine Order.[2] Members of the priory

---

people overnight and up to 350 people in the meeting rooms. Outdoor recreational opportunities available at the center include swimming, tennis, hiking, basketball, volleyball and horseshoes.

[2] Saint Benedict was an Italian monk who lived in the sixth century. He authored a rule, now known as the Rule of St. Benedict, for those who wished to become monks. The rule provides direction and instruction to the order, as well as to the individual monks. The rule is based on a moderation of the severe practices of the early monks. Feeling that most people could not live under such severe asceticism, Benedict wished his rule to allow for the creation of a community which could be entered into by a wide variety of people, rather than just the spiritually strong. The rule seeks to regulate life so that the strong have something to strive for while not crushing the weak by its demands. The Benedictine Order lives by the Rule of St. Benedict, as interpreted through the centuries.

Benedict's sister began a community for women close to his monastery in Italy which evolved into the Benedictine Sisters. The sisters are a part of the Benedictine Order.

The rule does not specify the type of work which its adherents should do. The work which is done is dictated by the area in

follow the Rule of St. Benedict. While this rule has many facets, the portion which is of primary significance to this action is chapter 53, "On the Reception of Guests," which begins, "Let all guests who arrive be received like Christ, for He is going to say, 'I came as a guest, and you received Me.' "[3]

The Benedictine communities which comprise the Federation of St. Gertrude engage in activities which they believe are appropriate for the time and their location. As times change and the communities relocate or expand, the work which the sisters do changes accordingly. When the sisters first arrived in Madison,[4] they came in re-

which the monks or sisters live, and by the circumstances of the time. During the time of Benedict, there was a great need to develop agriculture, and the monks helped people develop the skills needed to create productive fields and grow crops. In the Middle Ages, there was a need to preserve knowledge and writings, and the monasteries became centers of learning and preservation of culture. In modern times, the sisters' work has emphasized schools, hospitals, orphanages, homes for unwed mothers, and other work of that nature.

[3] Chapter 53, Rule of St. Benedict, also provides as follows:

As soon as a guest is announced, therefore, let the Superior or the brethren meet him with all charitable service. . . .

. . . .

After the guests have been received and taken to prayer, let the Superior or someone appointed by him sit with them. . . . The Superior shall break his fast for the sake of a guest, unless it happens to be a principal fast day which may not be violated.

. . .

Let there be a separate kitchen for the Abbot and guests, that the brethren may not be disturbed when guests, who are never lacking in a monastery, arrive at irregular hours. . . .

. . . .

The guest house also shall be assigned to a brother whose soul is possessed by the fear of God. Let there be a sufficient number of beds made up in it; and let the house of God be managed by prudent men and in a prudent manner.

[4] The foundress of the sisters' community, Mother Gertrude, began her work in Indian territory in the 1870's. The sisters then went to Elkton, South Dakota, where they founded a school for Indian children. After the school burned down, the sisters went

sponse to a call from a bishop to staff a parochial girl's school. The school began its operation in 1959, but over the years it experienced difficulty in attracting students.

During the mid-sixties, the sisters began offering weekend retreats.[5] In 1966, the Executive Committee of the Madison Interfaith Dialogue, a group of clergymen working to advance the spirit of ecumenism in the Madison area, requested that retreats be offered on a broader basis. The bishop approved this request. The sisters ultimately decided that their ability to provide retreats and a central gathering place for those interested in furthering ecumenism was of greater worth to the community than was their school. They closed the school, named their facilities "St. Benedict Center," and began to develop retreats and conferences consistent with their purpose of furthering an ecumenical dialogue within the city. They also believed that the reception of guests at the center was consistent with chapter 53 of the Rule of St. Benedict.

The sisters and members of the center's advisory board were concerned that the activities of the center would be focused too narrowly. The sisters and others active in the center's work wanted to carry on a continuing dialogue with as much of the community as possible. They

to Sioux City, Iowa. There they began an orphanage and a boarding home for young women. When it became evident that the area needed a hospital, they established one. They also started a home for unwed mothers. Bishop O'Connor of the Diocese of Madison requested their help in staffing a Madison school, and some of the sisters moved to Madison for that purpose in 1953.

[5] An ecumenical community of Protestant monks known as the Taise Brothers from Taise, France, was on the campus of the University of Wisconsin at this time. The Taise Brothers live according to a rule similar to the Rule of St. Benedict. They began bringing high school students from all religious backgrounds to the sisters' facilities for weekend retreats. Although the sisters had been involved in retreat work prior to this time, the need for an ecumenical retreat center became known to them as a result of the retreats conducted with the Taise Brothers.

did not want to limit access to the center solely to religious leaders and church groups. Toward the end of broadening the base of people who made use of the center, the sisters sent letters to businesses offering the use of the center as a meeting place.[6]

The center has been used as a meeting place by government agencies, university groups, church groups, nonprofit organizations, and business groups. The center provides several meeting rooms, including a large auditorium for these groups to use. It also offers outdoor recreational opportunities. The center provides overnight use of the facilities for a fixed fee,[7] including a room, linens, three meals, two coffee breaks, and facility use. It also provides, again for a fixed fee, daytime facility use, including lunch and coffee breaks, and evening facility use, including dinner and one coffee break. In addition, the center makes equipment such as projectors and typewriters available for a rental fee.

Effective September 1, 1977, the base rate for an overnight stay was $22.50 per person, or $40 per couple. For church related groups, however, these rates were discounted to $19 per person and $34 per couple. Daytime and evening rates were $6 and $5.50 per person, respectively. No discounts were offered to church groups for daytime and evening rates.

The food which the sisters prepare is simple, and normally includes vegetables grown in the center's garden. There is no menu. The rooms provided for overnight stay are also simple. Guests are expected to make up their own beds when they arrive.

---

[6] The letters indicated that the center was available for meetings, training events, workshops, seminars, and the like. The trial court concluded that the sisters sent the letters to businesses in order to solicit their use of the facilities and thus help keep the center viable and flourishing.

[7] The fixed fee is not broken down to include a separate charge for meals. The sisters have attempted to allocate a part of their gross receipts to meals for the purpose of bringing this action.

In accordance with the Rule of St. Benedict, if a guest arrives who cannot afford to pay for food or lodging, he is not turned away. The guest is asked to do some work around the center in exchange for the sisters' hospitality. Even those guests who pay are invited to help with the dishes.

Guests at the center are given a short orientation lecture and are invited to attend the daily prayer meetings if they wish to do so. The sisters join the guests at their meals and converse with them. They do not discuss religion during their meals with business guests unless the guests bring it up.

The sisters' attorney received a letter dated January 10, 1974, from a representative of the department which stated that it would be necessary to have St. Benedict Center register for sales tax, obtain a permit, and make records for sale of meals available from September 1, 1969 to date. He also received a letter dated February 8, 1974, stating that the sisters fell within the definition of "retailer" provided in sec. 77.51(7)(a), Stats., and that the gross receipts from their sale of meals were subject to taxation.[8] Section 77.52(12), Stats., provides that any person who operates as a seller in the State of Wisconsin without a permit is guilty of a misdemeanor.

The sisters brought this action for a declaratory judgment, claiming that the state's threat to impose a sales tax on them violates their right to the free exercise of their religion, contrary to both the state[9] and federal[10]

---

[8] In the February 8, 1974 letter, the department also indicated that receipts from the lodging which the sisters furnished was exempt from taxation pursuant to sec. 77.52(2)(a)1, Stats.

[9] Article I, sec. 18, Wisconsin Constitution, provides:

The right of every man to worship Almighty God according to the dictates of his own conscience shall never be infringed; . . . nor shall any control of, or interference with, the rights of conscience be permitted, or any preference given by law to any religious establishments or modes of worship; . . . .

constitutions,[11] and to 42 U.S.C. sec. 1983.[12] The sisters also asked that the department be enjoined from attempting to penalize them for failure to obtain a sales tax permit and from requiring them to pay a tax on their sales. In its answer, the department requested a judgment declaring that the sisters are required to obtain a sales tax permit for the sale of meals, and to pay tax on non-exempt sales.

Two issues are raised for our consideration on appeal:

(1) Does the sales tax apply to the sisters' sale of meals to business groups?

(2) If the sales tax does so apply, does imposition of liability for collection of the sales tax on the sisters violate their right to the free exercise of their religion?

(1) *Applicability of Sales Tax*

The sisters first contend that the sales tax statutes do not apply to their sale of meals to business groups.[13]

---

[10] The first amendment to the United States Constitution provides: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

[11] Despite the different wordings of the two constitutional provisions, they are "intended to effect the same objects . . . preserving to individual citizens the right to exercise their religious beliefs freely." *American Motors Corp. v. ILHR Dept.*, 93 Wis.2d 14, 29, 286 N.W.2d 847, 854 (Ct. App. 1979).

[12] 42 U.S.C. sec. 1983 provides as follows:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

[13] Nearly all of the other groups which use the center's facilities would be exempt from the sales tax. Section 77.54, Stats., provides for general exemptions from the sales tax. Section 77.54 (9a) exempts the "gross receipts from sales to . . . any . . .

The department relies on sec. 77.52(1), Stats., to establish its taxing authority. That statute provides in part: "For the privilege of selling . . . tangible personal property . . . at retail a tax is hereby imposed on all retailers . . . ." Tangible personal property is defined broadly as "all tangible personal property of every kind and description." Sec. 77.51(5).

The sisters argue, however, that they are not retailers, and that the tax thus does not apply to them. The term "retailer" is defined by statute as follows: " 'Retailer' includes: (a) Every *seller* who makes any *sale* of tangible personal property or taxable service." (Emphasis added.) Sec. 77.51(7)(a), Stats. The terms "sale" and "seller" are given these definitions:

"Sale", "sale, lease or rental", "retail sale", "sale at retail", or equivalent terms include any one or all of the following: . . .

. . . .

(f) The furnishing, preparing or serving for consideration of food, meals, confections or drinks. Sec. 77.51 (4), Stats.

"Seller" includes every person selling . . . tangible personal property or selling . . . or furnishing services of a kind the gross receipts from the sale . . . of which are required to be included in the measure of the sales tax. Sec. 77.51(9), Stats.

Section 77.54(20) (c)1, Stats., provides that "[t]he gross receipts from sales of meals, food, food products and beverages sold by any person, organization or establishment for direct consumption on the premises are taxable . . . ."

Thus, in furnishing meals for consideration, the sisters are making sales. Sec. 77.51(4), Stats. Because the gross receipts from the sale of the meals are subject to taxation, sec. 77.54(20)(c)1, the sisters are a seller. Sec.

association organized and operated exclusively for religious, charitable, scientific or educational purposes."

77.51(9). Because the sisters are a seller making sales of tangible personal property, they are a retailer, sec. 77.-51(7)(a), and are accordingly subject to taxation by virtue of sec. 77.52(1).

The sisters, however, point to a different definition of "retailer" to suggest that they are not covered by the sales tax statutes. Section 77.51(7)(b), Stats., provides that "retailer" includes a person "engaged in the business of making sales of tangible personal property." The sisters claim that they are not engaged in a business, since they are not engaged in an activity "with the object of gain, benefit or advantage." Sec. 77.51(8).

The sisters argue that this definition of retailer is applicable rather than the definition provided in sec. 77.51(7)(a), Stats., because the latter definition is meaningless. They reason: In order to be a retailer under sec. 77.-51(7)(a), it is necessary to be a seller. In order to be a seller under sec. 77.51(9), one must sell something, the gross receipts of which are required to be included in the measure of the sales tax. But the receipts are only required to be included in the measure of the sales tax, the sisters assert, if the seller is a retailer under sec. 77.52(1). They conclude that these statutes revolve on a perpetual track, and are ultimately meaningless.

This logic does not take into account sec. 77.54(20)(c)1, Stats., which expressly provides that the sale of meals is subject to the sales tax. Thus, the sisters are a seller under sec. 77.51(9), Stats., not because they are a retailer, but because they are selling meals, the gross receipts from which are expressly required to be taxed. Accordingly, the sisters fit within the definition of retailer found in sec. 77.51(7)(a), even if they are not retailers within the meaning of sec. 77.51(7)(b).

The sisters next contend that they are exempt from the sales tax because they make only occasional sales. An occasional sale is defined by sec. 77.51(10), Stats.:

(a) Isolated and sporadic sales of tangible personal property or taxable services where the infrequency, in relation to the other circumstances, including the sales price and the gross profit, support the inference that the seller is not pursuing a vocation, occupation or business or a partial vocation or occupation or part-time business as a vendor of personal property or taxable services. . . .

. . . .

(c) Sales of admissions or tickets by a . . . church . . . or similar organization to an event, including a meal, not involving professional entertainment, conducted by such organization, when such organization is not engaged in a trade or business and not otherwise required to have a seller's permit, and when no more than 3 such events were conducted by the organization in the previous calendar year and no more than 3 are anticipated during the current calendar year and such events do not fall on more than 7 different days within the calendar year.

The occasional sales of tangible personal property and services are exempt from sales tax. Sec. 77.54 (7), Stats.

The sisters do not dispute that they sold meals on more than three occasions per year. They suggest two reasons, however, why sec. 77.51 (10) (c), Stats., should not be seen as a limitation on the sec. 77.51 (10) (a) definition of occasional sales. The first of these is that sec. 77.51 (10) (a) should be read together with the definition of retailer found in sec. 77.51 (7) (b), to establish the legislative purpose of taxing only business sales. Accordingly, sec. 77.51 (10) (c) should come into play only when the person claiming exemption is engaged in a business. This argument is unsupported by either logic or authority. The three-event rule is a specific legislative definition of what should and should not be considered an occasional sale. Further, the statute by its terms applies only to organizations which are not engaged in a business.

The second contention is that sec. 77.51 (10) (c), Stats., applies only to admissions, and that the three-event rule

thus pertains only to amusement or entertainment events. While the statute does use the term admissions, it also refers specifically to the sale of admissions "to an event, including a meal." This language indicates that the three-event rule was intended to apply to the sale of meals.

Because the sisters have been operating as a retailer within the meaning of the statute, and because their sales are not exempt as occasional sales, we conclude that the statutes required them to obtain a sales tax permit and pay tax on non-exempt sales of meals.

(2) *Free Exercise of Religion*

The sisters contend that requiring them to comply with the sales tax statutes infringes on their constitutional right to the free exercise of their religion. They presented substantial evidence at trial to prove that all of the work which they do is religiously, rather than commercially, motivated. Their evidence indicated that their reception of guests is consistent with the Rule of St. Benedict; hospitality toward visitors is an important part of that rule. They also presented evidence to show that they viewed eating with the guests at meals to be a religious activity. This is true in part because providing meals to guests and joining them while they eat promotes the ecumenical dialogue which they seek to establish, and in part because the meal itself is traditionally seen as a religious activity.[14] Because they see the serving of

[14] A cogent summary of the testimony on this point was provided by Rabbi Manfred Swarsensky, Rabbi Emeritus of Temple Beth El in Madison. He testified as follows:

From the point of view of the original and traditional Christian view, serving a meal is not just a secular activity, but it's the Eucharist, communion service, and other meals, they were always regarded as a sacramental meal in the broader sense of the word; namely, there is not only the presence of the individual who participates of the meal but there also is a visible or invisible presence of God that even goes back to the Ancient Greeks. It is

meals as an exercise of their religious beliefs, they urge us to hold that taxation of the sale of those meals is taxation of religion, in violation of the freedom of religion guarantees of the state and federal constitutions.

In ruling on this issue, the trial judge made the following findings of fact:

(1) None of the work performed by the plaintiff Sisters is done for profit.

(2) Members of business groups and other non-religious groups who eat meals purchased at the center are *not* involved in any religious activities of the plaintiffs.

(3) The record is barren of evidence that any religious dialogue took place at meals between the Sisters and business or other non-religious guests.

(4) The Center operated at a net loss during each of the years 1973 through 1977.

(5) The plaintiff corporation was organized exclusively for religious and charitable purposes.

(6) A number of business groups and other persons not exempt from the sales tax have eaten and paid for meals at the Center.

(7) Church and religious-related groups are charged less for meals than are business groups and other non-exempt users.

(8) During the years 1971 through 1974 the Center actively solicited patronage from Madison area business and industrial groups *without* making any reference to religion or the exercise thereof.

. . . .

(12) The sales of the meals in question to business and other non-exempt groups are not related to religion, and there is no probative evidence that they were so related.

---

for the purpose of renewing the kinship among the people who attend, the human kinship, and also renewing or reviving their relationship of the individual to God. This is the way a meal has been seen in the context of Christianity of ancient times. Now it has petered out a little bit in our secular thinking, but I do believe that a certain amount of that spirit which I briefly described still exists and does obtain also at the Center here. . . . I do realize, of course, meals have to be charged for and all the rest, I mean, all these things go with that; but the purpose, the direction is very different from any commercial way of serving meals.

(13) The plaintiff Sisters were engaged in a business rather than a religious exercise in furnishing and selling meals to business and other non-exempt groups at rates higher than those charged religiously related groups.

The basis for the last finding is explained in the court's memorandum decision. The court noted that the sisters had solicited inquiries about the use of the center by members of the business community, "probably in order to keep the center viable and flourishing." The court also found that the sisters' discount of their rates for church-related groups was an indication that they were not pursuing an exercise of their religion when they served meals to business groups. For these reasons, the court concluded that the sale of meals to business groups was a commercial activity, and that subjecting that activity to sales taxation did not violate the sisters' free exercise rights.

When a trial court acts as the finder of fact, we will sustain its findings unless they are against the great weight and clear preponderance of the evidence. "Also when more than one reasonable inference can be drawn from the evidence, this court is obliged to support the finding made by the trial court." *Onalaska Electrical Heating, Inc. v. Schaller*, 94 Wis.2d 493, 501, 288 N.W.2d 829, 833 (1980).[15]

---

[15] The sisters suggest that an appellate court, when determining whether rights guaranteed by the United States Constitution have been abridged, has a duty to determine the facts independently, citing *Bachellar v. Maryland*, 397 U.S. 564, 566 (1970). This is not the standard of review which has been adopted in Wisconsin. However, when "the principal facts are undisputed and the controversy centers on ultimate findings of fact or conclusions of law, we are not bound by the findings of the trial court but may proceed to examine the record in order to reach our own determination." *State v. Ascencio*, 92 Wis.2d 822, 834, 285 N.W.2d 910, 916 (Ct. App. 1979).

The Wisconsin Supreme Court has recognized that "[n]o liberty guaranteed by our constitution is more important or vital to our free society than is a religious liberty protected by the free exercise clause of the first amendment." *State v. Yoder,* 49 Wis.2d 430, 434, 182 N.W.2d 539, 540 (1971), *aff'd sub nom., Wisconsin v. Yoder,* 406 U.S. 205 (1972). Accordingly, the test for determining whether the state is violating the free exercise of religion is strict. To withstand a free exercise challenge, there must be either no infringement by the state on free exercise, or if free exercise is burdened, the burden must be justified by a "compelling state interest in the regulation of a subject within the State's constitutional power to regulate." *Sherbert v. Verner,* 374 U.S. 398, 403 (1963) quoting *NAACP v. Button,* 371 U.S. 415 (1963). Even if the burden is "incidental," this test must be met. *Sherbert,* 374 U.S. at 403. "No mere showing of a rational relationship to some colorable state interest will suffice; in the highly sensitive area of religious freedom, only the gravest abuses endangering paramount interests justify state intrusion." *State v. Kasuboski,* 87 Wis.2d 407, 416, 275 N.W.2d 101, 105 (Ct. App. 1978).

It is not sufficient, however, for a person challenging the application of a statute on free exercise grounds merely to show that the statute burdens him in some way. The burden must be related to the exercise of a religious belief.

The Free Exercise Clause . . . withdraws from legislative power, state and federal, the exertion of any restraint on the free exercise of religion. Its purpose is to secure religious liberty in the individual by prohibiting any invasions thereof by civil authority. Hence it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against

him in the practice of his religion. *Abington School District v. Schempp,* 374 U.S. 203, 222–23 (1963).

We must therefore determine whether application of the sales tax to the sisters' sale of meals has a coercive effect upon their exercise of religion.

The taxation of religion, or a tax laid specifically on the exercise of religion, is inherently unconstitutional as a coercive burden on the free exercise of religion. *Murdock v. Pennsylvania,* 319 U.S. 105, 108 (1943). The sisters suggest that the sales tax is, in effect, a tax on religion, and is accordingly violative of their right to freedom of religion.

In order to evaluate this contention, we bear in mind that there are present in this case two conflicting perspectives on whether the meals which the sisters serve and which the state seeks to tax are part of a religious activity. The testimony presented by and on behalf of the sisters indicates that inviting guests into the facilities, serving them meals, eating and interacting with them, and providing the opportunity for a dialogue, whether or not religious and whether or not it actually takes place, is a religious activity in accord with the Rule of St. Benedict and the sisters' dedication to the principle of ecumenism. The sincerity of this belief has not been questioned, and the court may not evaluate the validity, reasonableness, or merits of the belief. *Yoder,* 49 Wis.2d at 436, 182 N.W.2d at 541–42. We must therefore accept as a given that the sisters are engaged in the exercise of religion when they serve meals to their guests and join them in dining.

From the perspective of the business guests of the center, however, the trial court found that partaking in meals was not a religious activity. Only one businessman testified that he had attended any prayer meetings at the center. The judge found the record as a whole

devoid of evidence that business groups felt that sharing the meals was a religious exercise. This formed part of the basis for the court's conclusion that the meals which the sisters serve are not part of an exercise of religion.

It is the sisters, however, who seek exemption from taxation on religious grounds; not the businessmen. For the purpose of evaluating the sisters' claim that imposing a sales tax on them violates their freedom of religion, the religious views of their guests are irrelevant. We must therefore accept as asserted that the sisters engage in religious activity when serving meals to guests and when eating with them.

Our next inquiry is whether the fact that the sisters charge for the meals as part of the fee for using the facilities transforms a religious activity into a commercial one. We conclude that it does not. The Supreme Court was faced with a similar question in *Murdock*, 319 U.S. 105. In that case, a city required a member of Jehovah's Witnesses to pay a fee and obtain a license before he could sell religious books and tracts door to door. Justice Douglas, writing for the Court, first found that the distribution of religious literature was protected by the free exercise clause. He then addressed the issue of whether it was proper to exact the license tax as a condition of distributing the literature when the Jehovah's Witness asked for money in exchange for the literature:

[T]he mere fact that the religious literature is "sold" by itinerant preachers rather than "donated" does not transform evangelism into a commercial enterprise. If it did, then the passing of the collection plate in church would make the church service a commercial project. The constitutional rights of those spreading their religious beliefs through the spoken and printed word are not to be gauged by standards governing retailers or wholesalers of books. . . . It is plain that a religious organization needs funds to remain a going concern. But an itinerant evangelist, however misguided or intolerant he

may be, does not become a mere book agent by selling the Bible or religious tracts to help defray his expenses or to sustain him. Freedom of speech, freedom of the press, freedom of religion are available to all, not merely to those who can pay their own way. As we have said, *the problem of drawing the line between a purely commercial activity and a religious one will at times be difficult.* On this record it plainly cannot be said that petitioners were engaged in a commercial rather than a religious venture. It is a distortion of the facts of record to describe their activities as the occupation of selling books and pamphlets. (Emphasis added.) *Murdock,* 319 U.S. at 111.

In *Follett v. McCormick,* 321 U.S. 573 (1944), the Court made clear that its holding in *Murdock* was not limited to itinerant preachers who merely helped defray expenses by charging for the materials they distributed. In that case, the Court held that even when the seller was not itinerant and made his living by selling religious materials door to door, conditioning his right to sell the materials upon payment of a license tax violated his right to the free exercise of his religion.

■■■

By the same process of reasoning, we conclude that the sisters' activities should not be considered "commercial" simply because they charge a fee for the meals. The trial court's findings to the contrary are not supported by the great weight and clear preponderance of the evidence.

As we have noted, the sisters introduced a substantial amount of testimony to the effect that the reception of guests, and particularly eating meals with them, was purely a religious activity. That testimony was not contradicted by the state. The trial court's finding that the sale of meals was commercial was based upon two inferences, neither of which is supported by the record.

The first of these inferences was that the sisters invited business groups to use the facilities in an attempt to generate income and keep the center running. The court

drew this inference from letters which the sisters sent to businesses to make them aware of the center's existence. While the letters included a fee schedule, we do not agree with the court's implicit conclusion that the letters, by including the schedule and failing to mention religion, give rise to an inference that the sisters were engaged in a commercial activity. The religious nature of the sisters' activities was made clear to the business groups which responded to the letters. The inference that the sisters solicited groups for a commercial purpose is also inconsistent with the sisters' testimony that they turned away groups which did not fit into their community.[16] All of the evidence in the record which addresses this point indicates that the sisters invited business groups into the center in order to expand their role in developing an ecumenical dialogue in the community; to interact with as many people as possible who might be interested in their activities.[17] In light of the great deference we must give to persons or groups who sincerely believe that their activities are religious, we cannot conclude that the record supports a finding that the sisters engaged in a commercial activity.

The court's second inference was that the discounted rates made available to church groups reflected a commercial purpose in inviting business groups to use the facilities. We do not believe that this inference is reasonable in light of the sisters' testimony that a lower rate was charged to those groups solely because the payment of fees was thought to be more burdensome to nonprofit church groups than it would be to business

[16] As an example, the sisters indicated that they had turned away a "mind expanding" group.

[17] The sisters testified that they had turned away groups whose purpose appeared to them to be inconsistent with the development of an ecumenical dialogue.

groups.[18] The state made no attempt to contradict this explanation for the rate differential.

We conclude on the basis of the record as a whole that the sisters were at no time engaged in a commercial enterprise in furnishing meals to business groups. The uncontradicted evidence demonstrates that they were pursuing a purely religious purpose in so doing.

Given that the sisters were engaging in the free exercise of their religion in furnishing meals for a fee to business groups who used their facilities, we must determine whether the sales tax is a tax on their religious activities, or, if not, whether it is nonetheless a burden on the free exercise of their religion.

Not all taxation imposed on a religious group is inherently burdensome of free exercise rights. As the Court stated in *Murdock*, 319 U.S. at 112:

> We do not mean to say that religious groups . . . are free from all financial burdens of government. We have here something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities. It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon. (Citation omitted.)

As the court stated in *Muste v. Commissioner*, 35 T.C. 913, 918 (1961): "It is clear . . . that a taxing statute is not contrary to the provisions of the first amendment unless it directly restricts the free exercise by an individual of his religion." Unless the tax is imposed as a condition on the right to exercise one's religion, or unless

[18] Sister Mary David Walgenbach testified as follows:

Religious communities we give a special charge to because we know from our own experience how hard it is to make ends meet, and we do this because we believe some people can afford to carry their weight better than others.

its imposition is a burden to free exercise, the tax does not violate the first amendment.[19]

In order to determine whether application of the sales tax to the sisters' activities is constitutional, we must consider the nature of the sales tax. Unlike the license tax in *Murdock*, the sisters are not required to pay the tax as a condition of their exercise of religion.[20] Although the sisters are liable for the tax if it is not paid to the state, the tax may be collected from the consumer. Sec. 77.52(3), Stats. We take judicial notice of the fact that most retailers, including establishments which prepare and sell meals, collect the sales tax from the consumer. Thus, the sisters are not being asked to pay a tax as a condition of the exercise of their religion. They are instead being asked to collect a tax from the consumer and pass it along to the state. This taxing scheme avoids the fears of the Court in *Murdock*, 319 U.S. 105; the state cannot easily use the tax to deter the sisters from exercising their religion.[21] Thus, this is not a tax imposed directly on religion, and it does not violate the first

[19] *See also*, Burns, *Constitutional Aspects of Church Taxation*, 9 Colum. J. L. & Soc. Prob. 646, 661 (1973).

[20] We note that the sisters would be required to pay a $2 permit fee as a condition of obtaining the permit. Sec. 77.52(8)(a), Stats. This appears to be "a nominal fee imposed as a regulatory measure to defray the expenses of policing the activities in question." *Murdock*, 319 U.S. at 113–14. The sisters have not argued otherwise. A nominal fee of this type is not suspect, as is a license tax, and may be imposed as a condition of obtaining the permit.

[21] We are not presented with the question of whether the rights of a person who pays for and consumes the meal, who does not qualify for sales tax exemption, and who views dining with the sisters as a religious exercise, would be infringed by requiring him to pay sales tax for the meal. The sisters do not have standing to raise the rights of another in challenging the statute. *McGowan v. Maryland*, 366 U.S. 420, 429 (1961).

amendment unless it imposes a burden on the sisters' free exercise of religion.

Our inquiry must shift, then, to whether imposition of sales tax liability from the sisters' sale of meals, which they may discharge by collecting the tax from the consumers or by demonstrating that the consumer is an exempt purchaser,[22] imposes an unconstitutional burden on their exercise of religion. On the record before us, we must hold that it does not.

Statutes are presumed to be constitutional. One who challenges the constitutionality of a statute has the burden of demonstrating its unconstitutionality beyond a reasonable doubt. We must indulge in every presumption to sustain the statute against an attack on its constitutionality. *Wis. Bingo Sup. & Equip. Co. v. Bingo Control Bd.*, 88 Wis.2d 293, 301, 276 N.W.2d 716, 719 (1979).

The sisters have failed to put forth any evidence to indicate that requiring them to act as a collector of the sales tax would have a coercive impact on their religious beliefs, or that it would burden their free exercise of those beliefs. The only burden to the sisters which we envision is that they will be required to keep more complete bookkeeping records than those which they now have. This burden, if in fact it is a burden, would not infringe on the free exercise of their religion. The burden is no greater than that imposed by the requirement that a church withhold taxes from the salaries of its janitors and pianist and transmit them to the government, a requirement that has been sustained against a free exercise attack.[23] We conclude that the sisters have

---

[22] *See* footnote 13 of this opinion.

[23] *Eighth Street Baptist Church, Inc. v. United States*, 291 F. Sup. 603 (D. Kan. 1968), *aff'd on other grounds*, 431 F.2d 1193 (10th Cir. 1970).

not overcome the presumption of constitutionality of the sales tax statutes by demonstrating that their exercise of religion would be burdened by complying with them.[24]

The sisters have also failed to demonstrate that their liability for uncollected sales tax to date will burden their exercise of religion. If the sisters had applied for a sales tax permit before they began to sell meals, and had collected the tax and forwarded it to the state, any burden they may have now would not have arisen. We cannot hold that the sisters could defeat the taxing statutes by failing to comply with them, thus creating a burden when their tax liability began to mount up, and using that burden as a means of arguing that the taxing statutes are unconstitutional as applied to their sale of meals. In the absence of any evidence of an actual burden, however, we need only hold that the sisters have failed to demonstrate that their liability for taxes accrued to this date burdens their free exercise of religion.

We conclude that, while the sisters are engaged in a religious activity in furnishing meals to their guests for consideration, the requirement that they collect a sales tax on the sale of those meals is neither a tax on religion nor a burden to their exercise of religion. Accordingly, we sustain the constitutionality of the statute as applied to the sisters.

*By the Court.*—Judgment affirmed.

GARTZKE, P.J. (*dissenting*). I agree that the sisters are retailers whose sales are subject to taxation under

---

[24] Nor is there any evidence in the record which would lead us to conclude that imposing upon the sisters a duty to collect sales tax will lead to excessive entanglement of the state in the sisters' religious affairs. *See* L. Tribe, *American Constitutional Law* sec. 14–12 at 865–80 (1978).

sec. 77.52(1), Stats. I agree that the sisters are not restaurateurs but are engaged in the exercise of their religion when they sell meals to business groups who use their facilities. *Murdock v. Pennsylvania,* 319 U.S. 105 (1943), convinces me, however, that the tax is on the sisters' exercise of their religion and is therefore unconstitutional.

*Murdock,* 319 U.S. at 113, held that a state may not impose a charge or tax for the enjoyment of a right granted by the federal constitution. *See also Follett v. McCormick,* 321 U.S. 573, 577–78 (1944) (license tax on expression of faith by priest or preacher would be obnoxious to the constitution).

Section 77.52(1), Stats., imposes a tax on retailers for the privilege of selling. It is therefore a tax imposed upon the privilege of selling. *Ramrod, Inc. v. Department of Revenue,* 64 Wis.2d 499, 502–03, 219 N.W.2d 604, 606 (1974). The word "privilege," as used in the statutes taxing privileges, is synonymous with "right." *State ex rel. Froedtert G. & M. Co. v. Tax. Comm.,* 221 Wis. 225, 230–31, 265 N.W. 672, 674 (1936). Thus, sec. 77.52(1) places a tax on the right to sell meals.

The free exercise of religion is a constitutional right. Because the sisters exercise their religion when they sell meals, the tax on those sales is a tax on their exercise of a constitutional right. The tax is prohibited by *Murdock,* 319 U.S. at 113. *See also State v. Van Daalan,* 69 S.D. 466, 11 N.W.2d 523 (1943) (constitution as interpreted by *Murdock* prohibits imposition of sales tax on sale of religious tracts).

The lead opinion would avoid this conclusion because the sales tax may be collected from the consumer. Sec. 77.52(3), Stats. The pass-through provision is irrelevant to the issues before us. Section 77.52(1) expressly imposes liability for the tax on the sisters as retailers. The tax in law and fact is and must be paid by the sisters.

The sisters must pay the tax even if it is not collected from their customers. Who would doubt that a tax on the sisters for admissions charged to persons attending religious services conducted by the sisters would be a tax on their exercise of their religion even if the tax could be passed on to those attending? The hypothetical is based on unlikely facts, but the meals furnished by the sisters appear to be as much an exercise of their religion as would the holding of religious services.

Furthermore, the sisters may collect the sales tax from future customers, but the state has demanded records of sales made as early as September 1, 1969. The sisters may not be able to pass their accrued tax liability to past customers. There is then no way to escape the conclusion that enforcement of the tax as to past sales by the sisters is a tax upon an exercise of their religion.

I conclude that, under the circumstances presented, the sales tax is an unconstitutional tax on the right to free exercise of religion.